# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-85

**TOMMIE M. GRANGER, M.D.**

**VERSUS**

**CHRISTUS HEALTH CENTRAL LOUISIANA, ET AL.**

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 211,938
HONORABLE GEORGE C. METOYER, JR., DISTRICT JUDGE

**********

**JIMMIE C. PETERS**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and Sylvia R. Cooks, Oswald A. Decuir, Jimmie C. Peters, and Shannon J. Gremillion, Judges.

**AFFIRMED AS AMENDED.**

**Thibodeaux, Chief Judge, dissents and assigns written reasons.**

**Roy C. Cheatwood**
**Donna D. Fraiche**
**Aubrey B. Hirsch, Jr.**
**Baker, Donelson, Bearman, Caldwell & Berkowitz**
**201 St. Charles Aveune, Suite 3600**
**New Orleans, LA 70170**
**Telephone: (504) 566-5200**
**COUNSEL FOR DEFENDANT/APPELLANT/APPELLEE:**
     **Christus Health Central Louisiana d/b/a Christus St. Frances Cabrini Hospital**

**Jimmy R. Faircloth, Jr.**
**Barbara Bell Melton**
**Leah M. Penny**
**The Faircloth Law Group, LLC**
**1412 Centre Court,  Suite 203**
**Alexandria, LA 71301**
**Telephone:  (318) 619-7755**
**COUNSEL FOR PLAINTIFF/APPELLEE/APPELLANT:**
       **Tommie M. Granger, M.D.**

**PETERS, J.**

Both the plaintiff, Dr. Tommie M. Granger, and the defendant, Christus Health Central Louisiana, appeal a trial court judgment based on a jury damage award of $3,900,000.00 to Dr. Granger. For the following reasons, we amend the trial court judgment to reverse the jury's finding of a violation of the Louisiana Unfair Trade Practices and Consumer Protection Act, amend the general damages award by reducing it to $100,000.00, and amend the special damage award by reducing it to $2,894,000.00. We affirm the trial court judgment in all other respects.

## DISCUSSION OF THE RECORD

### *Pre-Incident History*

Resolution of the issues raised in the appeal now before this court involves an analysis of the professional relationship existing between a hospital and one of its staff physicians. This particular case is fact-intensive and involves the interpretation of the hospital's written procedures versus the procedure actually used to discipline Dr. Granger. In large part, it involves a determination of the due process rights owed a physician when the hospital chooses to effect its discipline procedure against that physician.

Christus Health Central Louisiana is a public health provider doing business as Christus St. Frances Cabrini Hospital in Alexandria, Louisiana. For the purpose of clarity in this opinion, we will refer to the defendant, hereinafter, as Cabrini Hospital. The rights, privileges, and responsibilities of the physicians associated with Cabrini Hospital are governed by a set of written rules, entitled "BYLAWS OF THE MEDICAL STAFF" (Bylaws), containing seventeen articles, with sections and subsections to each article. Unless otherwise specifically stated, reference herein to an "Article" will be a reference to an article in the Bylaws.

The general definitions applicable to the hospital/physician relationship are found in Article I. Article I, Section 2 defines the medical staff of the hospital as including "all medical, osteopathic, dental, oral surgery and podiatric physicians holding unlimited licenses from the appropriate Louisiana State licensure board who are privileged to attend patients in the Hospital." Article I, Section 3 recognizes the governing board of the hospital as the ultimate authority in hospital/physician issues. In the case of Cabrini Hospital, this governing board is its Board of Directors. Article II establishes five categories of medical staff membership at Cabrini Hospital: active, associate, courtesy, honorary, and affiliate. One of the permanent committees created by Article XI, Section 5(1), and recognized in Article I, Section 4 as the executive committee of the medical staff, is the Medical Executive Committee. The actions of this Medical Executive Committee in relation to this litigation are critical to the analysis herein.

Articles II through VI provide a detailed process whereby a physician receives hospital privileges as a member of the medical staff so that he or she may treat patients at the hospital. Article VI provides that reappointment to the medical staff is not automatic and that reappointment is for a maximum period of two years. Furthermore, Article VII provides a detailed process by which a physician's hospital privileges can be suspended or terminated.

The plaintiff in this litigation, Dr. Granger, is an Alexandria, Louisiana cardiovascular surgeon who had originally acquired hospital privileges as a member of the active Medical Staff at Cabrini Hospital in 1996. He renewed his hospital privileges at Cabrini Hospital without any difficulty each time it was necessary between 1996 and the December 2002 incident giving rise to this

2

litigation. In December of 2002, he was in good standing with Cabrini Hospital, and his hospital privileges were not subject to renewal until July 30, 2003.

From a personality standpoint, Dr. Granger could best be described as an intense individual who was sometimes difficult to work with. According to Dr. John Simoneaux, a Pineville, Louisiana psychologist who examined Dr. Granger on March 7, 2000, in relation to a child custody matter and was one of the many professionals who testified at trial, Dr. Granger is a passive-aggressive individual who has a tendency to be irritable, sullen, argumentative, and obnoxious.

When he first acquired Cabrini Hospital privileges, Dr. Granger was associated with MacArthur Surgical Clinic (Surgical Clinic) in Alexandria and remained so until he left the Surgical Clinic in mid-2002. According to Dr. James Driscoll Knoepp, a cardiovascular surgeon associated with the Surgical Clinic during the same time period as Dr. Granger, there were moments of friction between Dr. Granger and the other physicians with whom he worked.

Dr. Knoepp testified that in June of 2001, the Surgical Clinic partners caused Dr. Granger to undergo a psychological evaluation based on complaints from some of the clinic's professional staff. Dr. Knoepp also testified that a November 16, 2001 incident at Rapides Regional Medical Center (Rapides Regional), another health care provider in Alexandria, resulted in Dr. Granger taking a voluntary leave of absence from that hospital and undergoing a physical examination, a neurological examination, and a psychiatric examination. The Surgical Clinic suspended Dr. Granger's privileges during the leave of absence, then reinstated them when he returned to Rapides Regional.

Dr. Knoepp also testified that on May 9, 2002, the physicians at the Surgical Clinic caused a letter to be sent to Dr. Granger instructing him to enroll for a

comprehensive assessment with the Physicians' Health Foundation of Louisiana (Physicians' Health Foundation).[1]  Dr. Knoepp explained that this action was precipitated in part by an internal dispute concerning the finances of the Surgical Clinic and Dr. Granger's unwillingness to cooperate with the other physicians in addressing this dispute.  Dr. Granger refused to undergo a fourth psychological evaluation in just over two years and left the Surgical Center.  Still, Dr. Knoepp testified that he was personally satisfied with the outcome of the June 2001 mandated psychological evaluation and, given his close personal relationship with Dr. Granger, he took no part in the investigations ultimately giving rise to this litigation.

Dr. Granger did not necessarily disagree with Dr. Simoneaux's description of his intense nature.  He testified at trial that the June 2001 referral arose because, at that time, he was involved in a heated divorce and custody matter.  He complied with his former partners' mandate because he understood that they were concerned his marital difficulties were subjecting him to excess stress that might impact his practice.  According to Dr. Granger, he underwent a two-day evaluation and the psychologist found him to be free of any psychiatric, substance abuse, or personality problems.

With regard to the incident at Rapides Regional referred to by Dr. Knoepp, Dr. Granger testified that he agreed to obtain a general physical examination and to be examined by a neurologist and a psychiatrist of the hospital's choice.  Again, the subsequent tests revealed no problems that would affect his ability to perform his professional duties.

---

[1] The Physicians' Health Foundation offers confidential assistance to physicians who are suffering from substance abuse, depression, anxiety, or other disruptive behavioral patterns.

Although he had no difficulty in renewing his hospital privileges at Cabrini Hospital between 1996 and December of 2002, Dr. Granger's intense personality caused his relationship with Cabrini Hospital during that period to sometimes be less than smooth. According to Dr. Michael Finley, Cabrini Hospital's Chief Medical Officer[2] from May of 2001 through May of 2003, Dr. Granger was constantly critical of the Cabrini Hospital nursing staff and equipment and often made unsolicited suggestions concerning the improvement of patient care. Dr. Granger confirmed Dr. Finley's assertions on this point and acknowledged that he had difficulties over the years with Cabrini Hospital's equipment as well as the personnel assigned to his patients.

In mid-2002, and while still maintaining privileges at Cabrini Hospital, Dr. Granger accepted the position of Medical Director for Cardiovascular Services at Rapides Regional. Even before assuming this position at Rapides Regional, Dr. Granger had begun referring his high-risk patients to that facility for surgical procedures and treatment. Dr. Finley testified that Dr. Granger's activities in referring potential Cabrini Hospital patients to any other hospital was not only unacceptable to him, but that Stephen Frances Wright, Cabrini Hospital's Chief Executive Officer, had expressed his frustration to Dr. Finley concerning Cabrini Hospital's loss of patients by Dr. Granger's referral elsewhere.

### Incident History

With that general background, we turn to the incident that gave rise to this litigation. On December 18, 2002, one of Dr. Granger's patients at Cabrini

---

[2] Despite holding the position of Chief Medical Officer, Dr. Finley had no medical license to practice in Louisiana and, obviously, had no hospital privileges at Cabrini Hospital.

Hospital, an almost ninety-year-old male, had undergone a carotid endarterectomy[3] and was awaiting open-heart surgery involving a bypass procedure that was scheduled for the next day. Shortly before 4:00 a.m. on December 18, Amy McKithen, one of the nurses at the hospital, telephoned Dr. Granger and reported that the patient was having difficulty urinating and that there was drainage at the site of the surgical intervention in the neck. Dr. Granger testified that he authorized the nurse to insert a Foley catheter to resolve the urinary problem, instructed her to let the incision site drain, and instructed her to call him if the patient began experiencing any respiratory problems.

Kimberly Renee Fannin Trissler,[4] another nurse-employee of Cabrini Hospital, relieved Ms. McKithen at 7:00 a.m. on December 18. She testified at trial that Ms. McKithen related her conversation with Dr. Granger to her before leaving work. When Ms. Trissler reviewed the patient's chart at 7:30 a.m., she found no notation of respiratory distress, and the only notation concerning the incision site in the neck was that it was swollen and bruised. In fact, the patient's chart contained no indication that there had been drainage from that incision during the night. Ms. Trissler observed no additional swelling in the patient's neck area from 10:00 a.m. until 1:00 p.m. and, when she removed the dressing to clean and air the wound at 1:00 p.m., there was still no evidence of distress. However, according to Ms. Trissler, things took a turn for the worse at 2:00 p.m., when the patient began to complain of shortness of breath despite an oxygen level that appeared to be within normal limits.

---

[3] This procedure involved a surgical intervention in the neck designed to maximize the blood flow through the carotid artery during the patient's scheduled bypass surgery.

[4] Ms. Trissler is referred to throughout the record as Ms. Fannin. However, when she testified, she identified herself as Ms. Trissler.

At approximately 2:30 p.m., Ms. Trissler decided to call Dr. Granger and report the respiratory problem. However, before she made the telephone call, she observed Dr. Robert Freedman, an Alexandria, Louisiana cardiologist, standing at the nurses' station. Instead of telephoning Dr. Granger, she asked him to examine the patient.

Dr. Freedman was the patient's cardiologist and had referred him to Dr. Granger for surgery. When he examined the patient, Dr. Freedman observed that the patient had developed a large hematoma[5] at the incision point in his neck but was not in respiratory distress. Concluding that there existed a potential for significant complications if the patient's problems were not addressed immediately, Dr. Freedman instructed Ms. Trissler to telephone Dr. Granger. When Ms. Trissler expressed concern over Dr. Granger's reaction if she were to telephone him, Dr. Freedman volunteered to make the call. Dr. Freedman testified that when he telephoned Dr. Granger and informed him of the developments with the patient, Dr. Granger responded by stating that he would come to Cabrini Hospital immediately.

Dr. Granger testified that when he received Dr. Freedman's telephone call, he had just completed one coronary bypass surgical procedure at Rapides Regional and was in the final steps of scrubbing up to begin a second surgical procedure on another patient who was already under anesthesia. Initially, after receiving Dr. Freedman's call, Dr. Granger telephoned Cabrini Hospital to see if anyone was available in the operating room to take care of the problem, but when he found no one available, he left his already-anaesthetized patient and drove to Cabrini Hospital.

_____

[5] An area of accumulated blood under the skin and muscular tissue.

7

Ms. Trissler testified that after Dr. Freedman made the telephone call to Dr. Granger, he instructed the nurses to make sure the documentation was in order before Dr. Granger's arrival because otherwise, "it won't be pretty." She testified that Dr. Granger walked onto the hall as she walked out of the patient's room, and she heard him slam the door from the stairway. She asserted that Dr. Granger was angry—"bitching" and "complaining and griping and cussing." According to Ms. Trissler, Dr. Granger commented about the patient he had waiting at Rapides Regional and suggested that the nurses at Cabrini Hospital were "incompetent and stupid." She then left to retrieve a surgical tray for the doctor.

When Ms. Trissler returned to the patient's room, Dr. Granger was already in the process of removing a blood clot from the patient's neck with his fingers. She suggested that Dr. Granger was still complaining of incompetent nursing care, but she "toned him out." She did observe that the patient was awake and alert during the procedure. According to Ms. Trissler, the patient's incision was still oozing blood when she assisted in moving him to the Intensive Care Unit (ICU) of the hospital. Ms. Trissler acknowledged at trial that this was the only unprofessional encounter she ever experienced with Dr. Granger.

Evelyn Lacombe was another nurse working the floor on the afternoon of December 18, 2002. She was not assigned to monitor Dr. Granger's patient, but had seen him at mid-morning and observed no distress. She testified that while she would have had no problem placing the telephone call to Dr. Granger pursuant to Dr. Freedman's instruction, she was aware that Dr. Granger had a propensity to interact angrily with people. She also noted in her testimony that Dr. Freedman admonished the staff to make sure the patient's file was properly documented before Dr. Granger's arrival.

8

Ms. Lacombe testified that Dr. Granger arrived at the hospital in an angry mood: raging at the staff, using profanity, and condemning all Cabrini Hospital nurses as incompetent. In fact, according to Ms. Lacombe, he demanded the presence of Dr. Finley and Barbara Griffin, Cabrini Hospital's Divisional Nursing Director, even before he entered the patient's room. While criticizing Dr. Granger's demeanor, Ms. Lacombe also acknowledged that Dr. Granger had a right to be concerned about the care given to his patient.

Dr. Granger testified that he found his patient at Cabrini Hospital unattended, suffering from a large hematoma in his neck, and in severe respiratory distress. He also acknowledged his anger given the situation he found, and, before attempting to treat his patient, he summoned Dr. Finley and Ms. Griffin to the room so they could observe the patient's condition. He then cut the sutures at the incision site, and the blood that had accumulated in the wound spurted out. Given the amount of blood, he concluded that it had accumulated over a significant period of time.

After treating the wound and finding no active bleeding, Dr. Granger packed the wound and ordered that his patient be transferred to ICU. According to Dr. Granger, he took this step because he wanted his patient monitored more closely. He fully expected the staff to telephone him if new problems arose and, absent any further emergencies, he intended to return to Cabrini Hospital that evening to explore the wound, find the source of bleeding, and repair that defect. Before leaving the hospital, he telephoned the Cabrini Hospital operating theater to reserve a room that evening to make the necessary repairs. Dr. Granger testified that this telephone conversation occurred at approximately 3:07 p.m.

Dr. Finley testified that when he arrived on the patient's floor, Dr. Granger met him in the hall and told him that he wanted Dr. Finley to see the condition of

9

the patient. When they entered the patient's room, Dr. Finley observed that the patient was having trouble breathing. He also recognized that Dr. Granger was angry, but he did not hear Dr. Granger speak to the nurses and did not hear him use any offensive or inappropriate language. At trial, Dr. Finley testified that his only concern at the time of the incident was his discomfort in hearing Dr. Granger speak ill of the nurses in the presence of the patient. Specifically, Dr. Finley heard Dr. Granger complain, in the patient's presence, about the failure of the nursing staff to call him earlier.

Ms. Griffin testified that when she arrived at the patient's room, she observed that the patient had edema, or swelling, in the neck from the jaw line to the clavicle, both above and below the bandage. She also recognized that Dr. Granger was clearly upset. Ms. Griffin testified that despite his obvious irritation at the situation, Dr. Granger was not unprofessional in his comments or actions directed toward her or Ms. Trissler, the only other nurse present at the time. Instead, he focused on the care of his patient.

In listening to Dr. Granger's complaints, Ms. Griffin assumed that Ms. Trissler was the individual who failed to timely call Dr. Granger and began to question her concerning this failure. Ms. Trissler responded that the staff did call the doctor, but Dr. Granger then suggested that the telephone call from Ms. McKithen related only to the patient's need to urinate, not swelling at the incision site. With this misunderstanding in mind, Ms. Griffin reviewed the patient's medical chart and found a notation that at 2:00 a.m. that morning there was a small amount of bloody drainage seeping from the incision point in the patient's neck. The patient's medical chart also contained an entry wherein Ms. McKithen noted that she notified Dr. Granger that the patient's bladder was distended and there was

10

drainage from the right neck incision. The 4:00 a.m. entry suggested that there was a significant decrease in the drainage to the wound, and the remaining entries made by Ms. Trissler, after she came on duty and through 2:00 p.m., reflected no cause for alarm. Thus, Ms. Griffin saw no reason for anyone to contact Dr. Granger before that time.

However, according to Ms. Griffin, the 2:15 p.m. notation in the patient's medical chart was clearly cause for alarm. In that entry, Ms. Trissler documented her request to Dr. Freedman, noting that the patient was suffering from nausea, vomiting, and shortness of breath. Ms. Griffin testified that any swelling of the incision site would have been a cause for alarm and would have mandated a telephone call to Dr. Granger. However, there was no evidence of such an event before Dr. Freedman's examination. Additionally, she stated that in her experience a hematoma could manifest itself in a short period of time, especially if it is arterial in nature.

Ms. Griffin testified that she assisted Dr. Granger in evacuating the patient's hematoma[6] and in packing the wound. She was present when Dr. Granger ordered that the patient be transferred to ICU and observed Dr. Granger's exit from the floor immediately thereafter. According to Ms. Griffin, almost immediately after the patient was placed in ICU, the nurse on duty summoned Dr. Finley to the unit because of blood flowing from the repaired hematoma site.[7] Although the patient's medical chart contained the entry that the plaintiff's blood was "oozing" from the wound, Dr. Finley testified that he found the patient bleeding profusely. He

---

[6] Ms. Griffin described the removal of a grape-sized blood clot.

[7] There exists a factual dispute whether Dr. Granger left his patient bleeding when he returned to Rapides Regional or whether the wound started to bleed after he left Cabrini Hospital.

11

testified that he immediately telephoned Dr. Granger, who was in the process of performing surgery on his Rapides Regional patient.

Dr. Granger deviated from his surgery long enough to contact Dr. Philip Lindsay, an Alexandria, Louisiana trauma surgeon and critical care specialist, who was present at Rapides Regional. Dr. Lindsay agreed to address the apparently emergency situation at Cabrini Hospital for Dr. Granger and immediately traveled from Rapides Regional to Cabrini Hospital, arriving at 4:05 p.m. Dr. Lindsay testified that after observing the condition of the hematoma and the patient's respiratory difficulty, he transferred the patient to an operating room, found a small bleeding point in the area of the hematoma, repaired it, and closed the incision.

The coronary bypass surgery scheduled for the following morning did not take place. After completing his surgical duties at Rapides Regional on the afternoon of December 18, Dr. Granger returned to Cabrini Hospital to learn that Dr. Joseph Patton, the anesthesiologist scheduled to assist in the next day's surgery, had cancelled the procedure. Dr. Granger immediately replaced the patient on the next day's surgical roster.

The next morning, Dr. Granger was informed that his patient had again been removed from the surgery roster without anyone consulting with him. He was unable to contact Dr. Patton, but had a heated telephone conversation with Dr. Patton's partner, Dr. Francis Robichaux, concerning the situation. During the conversation, both doctors expressed anger and frustration over the situation. Dr. Robichaux explained at trial that he refused to participate in the surgery as it was his opinion the patient was not in an "optimal condition" to undergo the procedure. Dr. Patton testified that he found it necessary to cancel this "elective" surgery until the patient stabilized.

Notwithstanding the opinions of Dr. Robichaux and Dr. Patton, Dr. Freedman saw the patient again on the morning of December 19, 2002, and found that his cardiac symptoms were stable, although he still suffered from respiratory problems. Based on his overall findings, Dr. Freedman concluded that the patient's heart was sufficiently stable to reschedule the bypass surgery. Three days later, the window of opportunity to perform the surgery closed as the patient's kidneys failed. After developing coronary spasms and other organ failures, he died.[8]

### *Post Incident History*

Dr. Finley chose not to discuss with Dr. Granger his concern about Dr. Granger's criticism of the nurses in front of the patient. Instead, he decided to consult with Dr. David Carlton, Jr., who at that time was the President of the Medical Staff and Chairperson of the Medical Executive Committee. He did so in a person-to-person meeting shortly before noon on December 19. Neither Dr. Finley nor Dr. Carlton testified at length concerning the content of their December 19 conversation, and we are left only with speculation concerning the overall content. It was sufficiently alarming, however, to cause Dr. Carlton to suggest to Dr. Finley that he bring the subject to the attention of the Medical Executive Committee, which was to have its regular monthly meeting that same afternoon.

Without explaining why he was prompted to do so, on the morning of December 19, and before he met with Dr. Carlton, Dr. Finley interviewed Ms. Trissler and Ms. Lacombe to ascertain if anything might have occurred out of his sight or hearing the day before. His notes of these interviews reflect that these two nurses informed him that Dr. Granger "was a raging bull, that he used profanity,

---

[8] Neither Dr. Robichaux nor Dr. Patton seemed aware at trial that the patient had died after the surgery was cancelled.

13

and that he was rough with the patient." Although Dr. Finley also spoke with Ms. Griffin that morning, he did not take notes of his interview with her. Dr. Finley did not give his notes to the Medical Executive Committee, but he did use his notes while addressing the committee.

Article XI, Section 5(1)(a) provides that the Medical Executive Committee is comprised of eight voting members, most of whom also serve as officers of the medical staff, and four ex officio non-voting members, all being a part of the administrative staff of the hospital. According to Article XI, Section 5(1)(b)(v), one of its many duties "shall be . . . to pursue corrective action to necessary conclusions in accordance with Article VII." As previously stated, Article VII addresses the grounds for, and procedure to be applied in, investigating medical staff physicians. However, it also makes it clear that the Medical Executive Committee is an investigatory committee only and that its power is limited to a recommendation that others up the chain of command take one or a combination of any of the eleven actions set forth in Article VII, Section 3(a).

Under the structure of Article VII, the investigative process begins when the Medical Executive Committee receives a written request for an investigation from any one of a number of hospital officials stating that he or she has received information that might cause one to call into question the actions of a medical staff appointee. The very explicit language setting forth the particulars of how the written request should originate is set forth in Section 1 of Article VII as follows:

**GROUNDS FOR ACTION**

> Whenever, on the basis of information, written, oral or observed, and belief, the President of the Medical Staff, the Chief Medical Executive, or the Chief of a clinical Section, and the Chairperson of the Board or the Chief Executive Officer or designee in conjunction with one of these physicians has cause to question:

14

(a)   the clinical competence of any Medical Staff appointee;

(b)   the cure or treatment of a patient or management of a case by any Medical Staff appointee;

(c)   the known or suspected violation by any Medical Staff appointee of applicable ethical standards or the Bylaws, policies, rules or regulations of the Hospital or its Board or Medical Staff, including, but not limited to the Hospital's quality assessment and risk management programs; or

(d)   behavior or conduct on the part of any Medical Staff appointee that is considered lower than the standards of the Medical Staff or Hospital or disruptive of the orderly operation of the Hospital or its Medical Staff, including the inability of the appointee to work harmoniously with others; *a written request for an investigation of the matter shall be addressed to the Medical Executive Committee, making specific reference to the activity or conduct which gave rise to the request.* The Medical Executive Committee shall keep the Chief Executive Officer or designee fully informed of all action taken in connection therewith.

(Emphasis added.)

The obvious flaw in Dr. Finley's acceptance of Dr. Carlton's invitation to personally appear before the Medical Executive Committee rests in his failure to reduce his request for an investigation to writing. Without compliance with Section 1(d) of Article VII, there is no written record "of the activity or conduct which gave rise to the request" for an investigation.

The need for compliance with the written request requirement is made clear by what occurred when the eleven members of the Medical Executive Committee met on the afternoon of December 19.[9] Dr. Finley's oral presentation was not recorded, but his trial testimony establishes that he related much more information than his solitary complaint that Dr. Granger spoke ill of the nursing staff in the presence of his patient. He suggested to the Medical Executive Committee that Dr.

---

[9] Those identified as being present included Dr. Carlton, Dr. Robin R. Bennett, Dr. Patton, Dr. Gerald Foret, Dr. James Gates, Dr. Irene Ibanez-Manlapaz, Dr. Michael Dale Allen, Dr. David McCoy, Dr. Edan D. Moran, Dr. Maury K. Morrison, and Dr. Yasser M. Nakhlawi.

15

Granger had improperly evacuated the hematoma in the patient's room, as opposed to the sterile environment of the operating room; yelled profanities at the nurses; behaved in an extremely angry and agitated manner; and left a profusely-bleeding patient without any orders. He also reported to the committee members his understanding of the situation involving Dr. Granger's disagreement with the two anesthesiologists concerning whether to proceed with the bypass surgery. In fact, the one thing he appears not to have said to the Medical Executive Committee was his complaint concerning Dr. Granger making negative comments about the nurses in front of the patient. All of that which he related to the Medical Executive Committee was hearsay obtained from two of the three individuals he had interviewed that morning. There exists no evidence to suggest that he initially related anything concerning his discussion with Ms. Griffith that morning, and either he did not talk to Dr. Freedman and Dr. Lindsey before making his accusations or he failed to mention their opinions in his presentation. Additionally, although the patient's medical chart was readily available, Dr. Finley apparently did not examine the entries therein and, at trial, offered no explanation concerning why he did not make it available to the Medical Executive Committee.

The minutes of the December 19, 2002 meeting read, in pertinent part, as follows:

> **Conclusions:** A recent patient care event was discussed. A post-surgical patient developed critical complications and there was question regarding the timely and appropriate management of this complication.
>
> Committee members discussed the issues of breach of patient care standards/abandonment of the patient, whether to treat this as a Sentinel Event, or suspend the physician pursuant to the referenced Bylaws Article 7.2 – Investigative Procedure, 7.4 – Suspension of Privileges, and 7.5 Grounds for Summary Suspension. The members voted in favor of summary suspension of the physician. The physician's patients will be reassigned upon notification of suspension.

A sub-committee of MEC was recommended to investigate the matter during the suspension, composed of Drs. Bennett, McCoy and Carlton, Jr.

**Recommendations/Action/Follow Up:** After discussion, and upon a motion duly made and seconded, the MEC committee voted in favor of summary suspension. The investigation will follow the procedure noted in Article 7 of the Medical Staff Bylaws.

In this second phase of the investigative process, the Medical Executive Committee also chose not to follow the letter of its Bylaws. As set forth in Article VII, Section 5(a), the only ground for summary suspension is "whenever failure to take such action may result in an imminent danger to the health and/or safety of any individual." Thus, summary suspension cannot be used to punish a physician for a personality or professional issue not directly related to the situation covered by Article VII, Section 5(a). Furthermore, in order to impose immediate summary suspension, the Medical Executive Committee had to have found that such danger existed. That would have been an appropriate action under Article VII, Section 2(a) "[i]f the request for an investigation contains sufficient information to warrant a recommendation." In other words, having made that finding, the investigation of this incident should have ended.

It is only when the investigative request does not contain sufficient information that the Medical Executive Committee "shall immediately investigate the matter, appoint a subcommittee to do so, or appoint an ad-hoc investigating committee consisting of up to three persons." Article VII, Section 2(b). In Dr. Granger's case, the Medical Executive Committee made a recommendation of punishment while, at the same time, establishing an ad hoc committee to determine whether the punishment it imposed was appropriate.

This misstep could have been avoided had Dr. Finley chosen to use the authority available to him and not go immediately to the Medical Executive

Committee. Although an investigation of questions raised concerning medical staff appointees falls clearly within the duties of the Medical Executive Committee under the structure of Article VII, Dr. Finley, as the Chief Medical Executive of the hospital, also had the authority to summarily suspend Dr. Granger. Article VII, Section 5(a) states that various people, including the Chief Medical Executive, "shall each have the authority to summarily suspend all or any portion of the clinical privileges of a Medical Staff appointee or other individual whenever failure to take such action may result in an imminent danger to the health and/or safety of any individual. Such suspension shall not imply any final finding of responsibility for the situation that caused the suspension." For reasons not set forth in the evidentiary record, Dr. Finley chose not to use this authority.

Had Dr. Finley summarily suspended Dr. Granger, Article VII, Section 6(a) requires that he report that action immediately to the Medical Executive Committee, which would then investigate the matter threatening the health and/or safety of a particular individual, then take any further action needed under Article VII, Sections 2 and 3. In other words, in that situation, the Medical Executive Committee would represent a procedural safeguard by investigating whether Dr. Finley's act was supported by the facts.

Thus, the Medical Executive Committee, based on a procedurally flawed oral investigation request and an incomplete investigative report from Dr. Finley, and without allowing Dr. Granger the courtesy of a personal interview, voted to recommend that Dr. Carlton summarily suspend Dr. Granger's medical privileges at Cabrini Hospital. At the same time, the Medical Executive Committee voted to form an ad hoc subcommittee to investigate whether the evidence available to it supported its own decision.

The notification requirements of recommendations by the Medical Executive Committee are different depending on whether the physician at issue is entitled to a hearing on its recommendation. If its action does not entitle the physician to a hearing, Article VII, Section 3(c) requires that the Medical Executive Committee forward the report of its recommendation to the Board of Directors through the Chief Executive Officer. However, it is silent concerning who notifies the physician of the adverse recommendation.

Should the action entitle the physician a hearing, the Chief Executive Officer is still the vehicle through which the Medical Executive Committee reports. In that case, however, Article VII, Section 3(d) provides that the Chief Executive Officer does not immediately notify the Board of Directors. Instead, he or she notifies the affected physician in writing of the action, and delays notification to the Board of Directors pending either the outcome of a hearing or a determination that the physician has waived his hearing and/or appeal rights.

Nothing in Article VII requires that the Medical Executive Committee notify Dr. Granger that he was being investigated for anything. However, Article VII, Section 3(b) allows the Medical Executive Committee to notify Dr. Granger that it was *considering* recommending one or more of the disciplinary actions available to it under Article VII, Section 3(a), and invite him to participate in a pre-recommendation hearing. If such a hearing were to have occurred, Dr. Granger would have no appeal rights pursuant to that Section. However, Section A.1(a)(8) of Appendix A to the Bylaws specifically granted Dr. Granger the right to a hearing once the Medical Executive Committee *recommended* summary suspension. That Section states that "[a]n . . . individual holding a Medical Staff appointment *shall* be entitled to request a hearing whenever an unfavorable

recommendation has been made by the Medical Executive Committee or the Board regarding . . . suspension of total clinical privileges." (Emphasis added.)

When the Medical Executive Committee makes a disciplinary recommendation other than summary suspension, Article VII is silent concerning any notification requirement to the physician at issue. However, a recommendation to impose summary suspension imposes a specific notification requirement, not on the Medical Executive Committee, but on the person to whom the recommendation is directed. In this case, the Medical Executive Committee directed Dr. Carlton, then President of the Medical Staff and its Chairperson, to effect or reject the recommendation.

Once he decided to accept the recommendation, Dr. Carlton was obligated, pursuant to Article VII, Section 5(a), to notify a number of the administrative personnel in writing. One of those entitled to written notice, the Chief Executive Officer or his designee, was then obligated to notify Dr. Granger by letter of his summary suspension. *See* Article VII, Section 5(c).

Again, the procedure set forth in the Bylaws was not followed. Instead of Mr. Wright, in his capacity as the Chief Executive Officer of Cabrini Hospital, notifying Dr. Granger of his suspension, Dr. Carlton performed that task. By letter dated the same day as the Medical Executive Committee meeting, Dr. Carlton notified Dr. Granger that his clinical privileges at Cabrini Hospital were summarily suspended. The letter reads in pertinent part as follows:

> At a meeting held December 19, 2002, the Medical Executive Committee was asked to investigate the management of one of your hospitalized patients.
>
> After reviewing the events surrounding the management of this case, the Medical Executive Committee has recommended that I summarily suspend your clinical privileges.

> Therefore, your clinical privileges at CHRISTUS St. Frances Cabrini Hospital are summarily suspended. Grounds for such suspension are outlined in Article 7.5 of the Medical Staff Bylaws. I will immediately assign another Medical Staff appointee to care for your hospitalized patients, as directed in Article 7.4(a).
>
> Pursuant to the Bylaws, such suspension shall become effective immediately upon imposition. The Medical Executive Committee will investigate the matter resulting in suspension and follow the protocol for an investigative procedure. The summary suspension shall remain in force until the matter is resolved.
>
> Attached to this letter are copies of the above referenced Articles of the Medical Staff Bylaws.

In addition to being authored by the wrong person, the letter failed to contain the notification to Dr. Granger required by Section B.1(a)(2) of Appendix A that he had "the right to request a hearing on the recommendation within 30 days of receipt" of the notice, nor did it contain a copy of Appendix A as required by Section B.1(a)(3).

That same evening, as he completed another surgical procedure at Rapides Regional, and even before he received Dr. Carlton's letter, Dr. Granger received a note asking that he telephone Dr. Finley. In the ensuing telephone conversation, Dr. Finley informed Dr. Granger of the summary suspension and told him that he was not to see his patient again or contact the patient's family. Concerning the issue giving rise to the suspension, Dr. Finley informed Dr. Granger that the Medical Executive Committee was of the opinion that Dr. Granger had abandoned his patient. Dr. Finley made no mention of the purported underlying personality issues he had brought to the attention of the Medical Executive Committee.

Dr. Granger testified that the summary suspension came as a complete surprise to him as he had thought if anyone would be investigated for lack of care to the patient, it would be the nurses. Thus, at this point, the only information provided Dr. Granger was that the sole reason the Medical Executive Committee

recommended summary suspension was the medical complication arising from the patient's physical condition and the "question regarding the timely and appropriate management of this complication."

Had the procedural aspects of the Bylaws been followed, and had the summary suspension investigation been limited to the possible "imminent danger" to Dr. Granger's patient as specified in Article VII, Section 5(a), perhaps this litigation would not have evolved to the status it now occupies. Dr. Carlton testified that the members of the Medical Executive Committee discussed the possibility of tying the clinical care issue to behavior issues at the December 19 meeting, but correctly noted that the only evidence supporting a behavioral issue regarding Dr. Granger was of a hearsay nature. Additionally, although the minutes are silent on this point, Dr. Carlton testified that the Medical Executive Committee also delegated the administration of the investigation to Dr. Finley. Whether intentional or otherwise, this delegation resulted in two parallel investigations occurring at the same time, because, instead of acting as the administrator of the ad hoc subcommittee's investigation, Dr. Finley renewed his investigation of the behavioral issues he had divulged to the Medical Executive Committee. Thus, the ad hoc subcommittee focused on the clinical care provided to the patient and Dr. Finley focused on the behavioral issues.

On January 1, 2003, Dr. Roben Bennett, an Alexandria, Louisiana internal-medicine physician who specializes in kidney diseases, replaced Dr. Carlton as the president of the medical staff and chairman of the Medical Executive Committee.

The Medical Executive Committee received reports concerning the parallel investigations on January 9, 2009. Dr. Finley's report began to take shape within two to three days after the Medical Executive Committee meeting on December 19,

2002, when he continued his personal investigation by interviewing some of the nurses a second time and by interviewing others for the first time. In some of the interviews he took notes and in others he did not. According to Dr. Finley, Ms. McKithen told him that she changed the patient's dressing several times on her night shift, and that she had attempted to inform Dr. Granger of the bleeding problem, but that he hung up on her when she telephoned him. Additionally, he testified that other nurses informed him that they had issues with attempting to communicate with Dr. Granger because he would berate and intimidate them and make them feel inferior.

Dr. Finley also interviewed Ms. Griffin for a second time, but for some unexplained reason, still did not make any notes of this conversation. At trial, he testified that Ms. Griffin informed him of the procedure in treating the hematoma and told him that after assisting Dr. Granger in opening the neck wound, cleaning out the blood clots with his finders, and placing some gauze bandages on the site, she asked Dr. Granger "[D]ude, what are you going to do about this? It's bleeding." According to Dr. Finley, Ms. Griffin told him that Dr. Granger responded by saying, "I have a patient on the table at Rapides. Send him to ICU." and left the hospital. Dr. Finley either did not question Ms. Griffin concerning her opinion of Dr. Granger's professional demeanor at the time of the incident, or omitted that part of the interview in his testimony. Additionally, none of the nurses he interviewed in his follow-up investigation testified before the Medical Executive Committee at its January 9, 2003 meeting. The Medical Executive Committee was provided only with Dr. Finley's notes and his personal interpretation of his notes.

23

The ad hoc subcommittee took no steps in its investigative obligation until the day before the January 9, 2003 Medical Executive Committee meeting, when it interviewed Dr. Lindsay, Dr. Freedman, Dr. Patton, Dr. Finley, and Dr. Granger. Dr. Lindsay testified that he informed the subcommittee members that he believed Dr. Granger's conduct with the patient was appropriate. Dr. Freedman testified that he would not have left the patient had his patient been in distress or until he found the source of the bleeding. However, he also testified that at the time he saw Dr. Granger's patient, the respiratory distress was not severe. As previously stated, with regard to cancelling the surgery, Dr. Patton suggested that he felt it appropriate to cancel "the elective bypass surgery" until the patient stabilized.

Article VII, Section 2(d) requires that the ad hoc subcommittee provide Dr. Granger an opportunity to meet with it before it makes the report to the Medical Executive Committee. It further provides that "[a]t this meeting . . . the individual shall be informed of the general nature of the evidence supporting the question being investigated and shall be invited to discuss, explain or refute it." Dr. Granger testified that when he met with the ad hoc subcommittee, the discussion involved only the medical aspects of the case, and the questions directed to him primarily addressed why he left Cabrini Hospital after repairing the incision, and the status of the patient he left at Rapides Regional – in other words, only the medical care issues relating to his patient. Dr. Granger testified that when he met with the three doctors on January 8, he had no knowledge and was not informed that there was an ongoing parallel investigation of his behavior.

Nothing in the Bylaws requires the investigating body to file a written report with the Medical Executive Committee, although Article VII, Section 2(d) requires that "[a] summary of such interview shall be made by the investigating committee

24

and included with its report to the Medical Executive Committee." No written report was provided in this case. Instead, the minutes of the January 9, 2003 Medical Executive Committee meeting contain the notation that "[i]t was asked if consideration of the overall behavior/attitude of the physician entered into the focused review by the subcommittee since from the documentation it appears that Dr. Granger began the initial patient encounter on a 'negative note.'" The identity of the person to whom this question was addressed is not provided in the minutes, and the response recorded in the minutes does not contain an answer to the question. Instead, the minutes simply report that "[t]here was some discussion related to reports that nursing staff is reluctant to call Dr. Granger due to his tendency to be abrupt. The potential for an event such as this happening again with relation to Dr. Granger was discussed." It is unclear from the minutes whether the "reports" mentioned in the minute entry came from an unreported portion of the ad hoc subcommittee's investigation or from other sources, including Dr. Finley's report.

With the focus of the investigation now clearly tilted more toward behavioral issues than medical care issues, the Medical Executive Committee made a new recommendation. It recommended that, with regard to Dr. Granger's medical staff membership and clinical privileges, he be placed on a six-month probationary period "which will be defined to encompass both behavior and quality of patient care issues as imposed by the Medical Staff Bylaws and Rules & Regulations." The Medical Executive Committee further recommended that, as a part of the probation requirements, "any further events during the six month period would be considered grounds for summary suspension of privileges and could result in permanent suspension from the Medical Staff" and that his professional

activities at the hospital would be subject to "100% chart review . . . conducted on all of [his] cases for the duration of the stipulated probationary period."

The minutes of that day's meeting also include a brief section on "Follow Up," which states:

> Clarification with regard to the approach to be taken with regard to defining the terms of the recommended probationary period will be sought from hospital legal counsel. Chart review will be the responsibility of the Chief Medical Executive and a recommendation for a probationary status for Dr. T. Mack Granger's Medical Staff membership and clinical privileges will be forwarded to the local Governing Board at such time the terms of the probation have be [sic] clearly defined.

This minute entry suggests that the Medical Executive Committee treated its latest recommendation as having already been accepted. Additionally, this reference to "[c]hart review" marked the first time anyone even suggested that it might be helpful in the investigation to examine the patient's chart. However, the Medical Executive Committee left this task to Dr. Finley, the individual who had access to this source of information from the beginning. Additionally, nothing in the record suggests that the chart of the patient at issue in this litigation ever became a part of the subsequent investigative events.

While nothing in the minutes suggests to what entity the Medical Executive Committee intended to direct its recommendations, Article 11, Section 5(1)(b)(iv) states that one of its duties is to make recommendations to the Board of Directors "concerning matters relating to . . . Medical Staff" as well as other enumerated duties, including pursuing "corrective action to necessary conclusions in accordance with Article VII." Article II, Section 5(1)(b)(v). However, the Medical Executive Committee did not initially notify the Board of Directors of its actions with regard to Dr. Granger. Instead, immediately after the January 9, 2003 meeting, Dr. Finley sent Dr. Granger a letter stating that the Medical Executive

26

Committee had "met and made a recommendation for further action to the Governing Board." However, the letter did not state the particulars of the recommendation. Instead, the letter stated in pertinent part:

At this time:

1.     The Summary Suspension was appropriate;

2.     The summary suspension has expired and your clinical privileges are restored effective January 10, 2003.

3.     Under Article 7.3(c) and Appendix A of the Medical Staff ByLaws, this is not an appealable ruling;

4.     This action is effective immediately;

5.     This action is not reportable to the National Practitioner's Data Bank;

6.     Following Governing Board action, you will receive further communication regarding their decision about the recommendation made by the Medical Executive Committee.

This action is taken because of the committee's conclusion that you committed a serious error in judgment in your management of your patient on December 18, 2002. Although your initial response to the bleeding complication was appropriate in that you examined the patient, opened the wound, evacuated a large hematoma and attempted to control bleeding by packing the wound, leaving this patient, whom you knew to be anticoagulated and who had bled approximately 500 cc prior to your care without any significant period of observation by you, put the patient at significant risk for additional bleeding. In addition, simply ordering him transferred to the ICU without orders to the nursing staff and without arranging for any back up coverage when you knew that you would be in surgery at another hospital and, thus, unavailable for several hours, is below the standards of practice that CHRISTUS St. Frances Cabrini Hospital expects of its medical staff members.

This January 9, 2003 letter concluded with the statement "[t]his letter will become a part of your file and will be reviewed in connection with any future events."

Not only did this letter erroneously inform Dr. Granger that he was not entitled to a hearing on the summary suspension recommendation, but it made no mention of the most recent recommendation concerning probation. Additionally,

27

while the content of this letter may have been discussed in the Medical Executive Committee meeting, nothing in the minutes suggests the action was based on such a fact-specific scenario. Again, despite the obvious involvement of personality issues in the process, Dr. Granger was informed of only the professional care complaint. Despite being the author of the January 9, 2003 letter, Dr. Finley was unable at trial to explain why it did not mention Dr. Granger's behavioral and attitude problems, and the evidentiary record establishes through later testimony that the comment "Summary Suspension was appropriate" was not authorized by the Medical Executive Committee.

The action by Dr. Finley, acting for the Medical Executive Committee and Cabrini Hospital, of making this letter of reprimand a part of Dr. Granger's files at Cabrini Hospital entered a permanent censure in those files. As was the case with the minute notations of the January 9, 2003 meeting, this letter appears to attempt the imposition of a disciplinary action rather than a recommendation.

Dr. Granger had requested the presence of an attorney at the January 8 interview, and that request was denied. By a letter dated January 17, 2003, Dr. Granger's attorney requested that Cabrini Hospital give the doctor a hearing on the propriety of the summary suspension, or, alternatively, remove from the January 9, 2003 letter of reprimand the statement that the summary suspension was appropriate. Cabrini Hospital responded through its attorney that Dr. Granger would not be afforded a hearing on the issue. Specifically, the letter denying Dr. Granger a hearing based that denial on the fact that the matter was still at the recommendation stage from the Medical Executive Committee and had not yet been acted on by the Board of Directors. It also suggested that Dr. Finley's January 9, 2003 letter was nothing more than a letter of reprimand, which is not

grounds for a hearing. Either Cabrini Hospital's attorney was unaware of the complete January 9, 2003 recommendation of the Medical Executive Committee, or chose not to inform Dr. Granger of its content.

Had the Medical Executive Committee recognized that Section A(1)(a) of the Appendix granted Dr. Granger a hearing in the case of either the first or second recommendation, its additional duty was to forward the recommendation to the Chief Executive Officer, in this case, Mr. Wright. As we previously stated, Section B.1(a) of Appendix A requires that, upon receipt of that recommendation, the Chief Executive Officer is required to promptly notify the affected individual in writing, by "certified mail, return receipt requested, or hand delivery." The notification must contain "(1) a statement of the recommendation made and the general reasons for it; (2) notice that the individual has the right to request a hearing on the recommendation within 30 days of receipt of this notice; and (3) a copy of this Appendix A." Once the notice is forwarded to the physician at issue, "[t]he Chief Executive Officer or designee shall then hold the recommendation until after the individual has exercised or has waived the procedural rights as provided in the Hearing and Appeal Procedure in Appendix A." Article VII, Section 3(d).

There exists no evidence in the evidentiary record to suggest that Mr. Wright ever forwarded the appropriate notice to Dr. Granger. Instead, on January 29, 2003, the dispute was basically transferred from the Medical Executive Committee to the Cabrini Hospital Board of Directors. On that day, the Board of Directors met and was apprised of the Medical Executive Committee's January 9, 2003 recommendations. The minutes of that meeting reflect that Dr. Carlton appeared and summarized "the specifics of the case, the issues and the investigative process

29

conducted by the Executive Committee of the Medical Staff" and that Dr. Bennett "filled in any unaddressed issues." Dr. Finley was also present at the meeting and testified at trial that the Board of Directors focused on the same issue focused on by the Medical Executive Committee: Dr. Granger's behavioral misconduct (which Dr. Finley's January 9, 2003 letter does not mention).

The minutes from this January 29, 2003 meeting state that the Board of Directors did not accept the Medical Executive Committee's recommendation. Instead, it asked the Medical Executive Committee to "investigate further into this matter by interviewing all nurses involved, *consider the unprofessional conduct and behavior as a key issue*, and make a final recommendation back to the Executive Committee of the CHRISTUS Central Louisiana Board for final action." (Emphasis added.)

With the matter being returned to the Medical Executive Committee, and still struggling with his inability to obtain a forum wherein he could determine the specific charges against him and to adequately respond, on February 6, 2003, Dr. Granger filed this suit against Cabrini Hospital seeking injunctive relief. Specifically, Dr. Granger asked for "a formal declaration by the [trial] Court as to whether he is entitled under [Cabrini Hospital] Bylaws to a hearing (and in due course, to an appeal)" from Dr. Finley's January 9, 2003 letter stating that the summary suspension was proper.

The Medical Executive Committee next considered the continuing investigative process in its February 27, 2003 meeting. The minutes of that meeting note that Mr. Wright spoke to the Medical Executive Committee at this meeting, informing them of the Board of Director's concerns and informing the members present that the Board of Directors had also recommended that a formal

30

request be sent to Rapides Regional for information on "reports of disruptive behavior and any associated disciplinary action for this physician." This very specific directive from the Board of Directors did not make its way into the minutes of the January 29, 2003 meeting. Dr. Finley testified at trial that he did not know if a request was ever submitted to Rapides Regional, and he was not personally aware of the facts surrounding the alleged suspension.

Dr. Finley testified that when the Board of Directors sent the matter back to the Medical Executive Committee, Betty Bold, Cabrini Hospital's chief operating officer, conducted the investigation on the behavioral issues pursuant to the Board of Directors' instructions. According to Dr. Finley, he knew of no written records of Ms. Bold's investigation, and the Medical Executive Committee was provided only with summaries of Ms. Bold's interviews. It appears that Ms. Bold interviewed only the nurses, now for a third time. Additionally, it is unclear whether Ms. Bold's investigation occurred before or after the Medical Executive Committee's February 27, 2003 meeting.

The minutes of the February 27 meeting suggest that even before receiving the results of Ms. Bold's investigation, the Medical Executive Committee added to its prior recommendation by recommending that Dr. Granger "be requested to self-refer to the Physician's Health Foundation of Louisiana within 10 days for evaluation. It was further recommended that Dr. Granger be placed on probation for a period of six months." Such a recommendation would fall within those actions allowing Dr. Granger a hearing pursuant to Section 1(a)(9) of Appendix A, being an "imposition of [a] mandatory concurring consultation requirement."

There is no record of notice to Dr. Granger of this latest addition to the Medical Executive Committee's recommendation, but with this recommendation,

31

the matter returned to the Board of Directors, which, in turn, assigned the evaluation of the Medical Executive Committee recommendation to its Executive Committee. At its March 10, 2003 meeting, the Board Executive Committee voted to accept the Medical Executive Committee's recommendation with one substantive change: that Dr. Granger would have thirty days, rather than ten days, to effect the self-referral to the Physician's Health Foundation.[10] The minutes of the meeting assert that the "[d]iscussions centered around the nurses' interviews that addressed Dr. Granger's behavioral problems and on the quality of care given to his patient." The resolution itself reads as follows:

> RESOLVED, as recommended by the Medical Executive Committee, that Dr. T. Mack Granger be requested to self-refer to the Physician's Health Foundation of Louisiana within 30 days for evaluation, or risk consideration of further action; and, that Dr. Granger be placed on probation for a period of six months, is hereby ratified and approved by the members of the CHRISTUS Health Central Louisiana Executive Committee of the Board.

No notice was provided to Dr. Granger until almost a month later, on April 7, 2003, when Ms. Stich and Dr. Bennett signed a letter addressed to Dr. Granger wherein they informed him of the Board Executive Committee's action at the March 10, 2003 meeting and informed him that "both the Board and the [Medical Executive Committee] felt that your unprofessional behavior exhibited in the interactions with the staff was a contributing factor adversely affecting the care provided to this patient." However, the authors of the letter took the further step of

---

[10] The minutes reflect that those in attendance were Nancy Stich, the Chairperson of the Board of Directors; Dr. Robin Bennett, the Cabrini Hospital President of the Medical Staff; Dr. James Gates; Dr. Carlton; and Mr. Wright.

informing Dr. Granger that the Board Executive Committee did not approve the January 9, 2003 letter of reprimand.[11]

This April 7 letter also stated that a resolution was approved. However, the resolution set out in the April 7 letter differs from the one in the Board Executive Committee's minutes. The letter states that the Board Executive Committee approved the following resolution:

> **RESOLVED**, as recommended by the Medical Executive Committee, that Dr. T. Mack Granger be requested to self-refer to the Physician's Health Foundation of Louisiana within 30 days for evaluation *and treatment for anger management. Additionally, Dr. Granger will be expected to comply fully with any recommendations proposed by the Program,* or risk consideration of further action; and, that Dr. Granger be placed on probation for a period of six months.

(Emphasis added.)

Thus, the authors of the April 7, 2003 letter added the requirements that Dr. Granger be treated for anger management and that he fully comply with any recommendations that the Physician's Health Foundation for Louisiana would make.

The Board of Directors did not address the latest investigation findings or the content of the April 7, 2003 letter until some twenty-three days later, in its April 30, 2003 meeting. After considering the report of the Medical Executive Committee, the Board Executive Committee's minutes, and the content of the April 7, 2003 letter, the Board of Directors adopted the Medical Executive Committee's recommendation and the recommendation of the Board Executive Committee, "as stated in the March 10, 2003 minutes of the Executive Committee of the CHRISTUS Health Louisiana Board of Directors." It appears from these minutes that the Board of Directors adopted the resolution approved by the Board

---

[11] The letter does not explain which part or parts of the January 9, 2003 letter were disapproved.

33

Executive Committee in its minutes, not the one set out in the April 7, 2003 letter to Dr. Granger. However, there is no indication that Dr. Granger was ever informed that the Board of Directors adopted a resolution different than the one set out in the April 7, 2003 letter.

By the time the Medical Executive Committee next met on May 29, 2003, Dr. Finley had left Cabrini Hospital, and Dr. Granger had not referred himself to the Physicians' Health Foundation. It is not clear from the record why the Medical Executive Committee discussed the matter again, but the minutes from that meeting state that Dr. Bennett reported he had spoken to Dr. Granger "and advised him to resign or do the referral, but to no avail." Additionally, there is nothing to suggest how Dr. Bennett acquired the authority to give Dr. Granger the ultimatum. According to the minutes of the May 29 meeting, and despite the fact that its authority consisted of making *recommendations*, the Medical Executive Committee voted to send "a notice requiring him to submit a self-referral to [Physicians' Health Foundation of Louisiana] within seven (7) days. If after seven days the self-referral had not been done, then there would be an *automatic termination* of his privileges." (Emphasis added.)

On June 6, 2003, the Board Executive Committee adopted a similar resolution, stating that if Dr. Granger did not self-refer within seven days "*his medical staff membership and privileges shall be revoked.*" (Emphasis added.) The June 6, 2003 minutes note that Mr. Wright reported that Cabrini Hospital's attorney had stated that "it was acceptable for the Board to concur with the decision of the Medical Executive Committee prior to the actual due-process hearing. Dr. Granger would not technically be in a position to request a hearing until he has received the formal letter, which restricts his privileges."

34

Despite the clear language of both of these resolutions, Mr. Wright never forwarded Dr. Granger the notice required by Section B(1)(a) of Appendix A. Instead, Ms. Stich and Dr. Bennett sent Dr. Granger another letter, dated June 16, 2003, which contains language different from the resolutions of both committees and did not warn Dr. Granger that failure to self-refer would result in an automatic termination of his privileges. The letter stated, instead, that *"Should enrollment in this program not occur, the MEC will recommend revocation of your medical staff membership and privileges.* Should such an action occur you will be notified in writing of the recommendation and your rights to invoke the Hearing and Appeal Procedures under Appendix A of the bylaws." (Emphasis added.) At trial, Ms. Stich testified that she did not know why the June 16 letter differed from the resolution passed at the June 6 meeting.

On June 24, 2003, Dr. Granger amended his petition to assert that Cabrini Hospital had committed a bad faith breach of its Bylaws, had constructively revoked his clinical privileges, had defamed him, and had engaged in unfair and deceptive trade practices under the Louisiana Unfair Trade Practices Act (LUTPA), La.R.S. 51:1401, *et seq.* In addition to his prior request for injunctive relief, for the first time in the litigation, Dr. Granger sought a general damage award, damages for lost earnings, and an award of reasonable attorney fees and costs pursuant to La.R.S. 51:1409.

At its July 30, 2003 Board of Directors meeting, the issue of Dr. Granger's activities continued to be debated. The minutes of that meeting affirmatively assert that Dr. Granger had received the letter dated June 16, 2003, but that Dr. Granger had not self-referred. The minutes also noted that that Dr. Granger's hospital privileges would automatically terminate that day—July 30, 2003—absent a new

35

application from Dr. Granger, and that Dr. Granger had not applied for renewal of his privileges. The minutes also reference a scheduled future court hearing and, in that regard, note that:

> Our attorney has recommended that no further action should be taken by the Board or the Medical Executive Committee until the preliminary hearing on August 12th. As Dr. Granger has not re-applied, we have asked the hospital attorneys if we can stop action and what information, if any, would need to be presented to the National Data Bank. [Ms. Stitch] asked the Board to ratify the recommendations of the Medical Executive Committee and the CHRISTUS Health Central Louisiana Executive Committee.

The Board of Directors then voted to adopt the Medical Executive Committee's and the Board Executive Committee's recommendations. In enacting this resolution, the Board of Directors made no mention of the discrepancy between the recommendation of the Board Executive Committee and the notice provided to Dr. Granger.

On August 12, 2003, the parties entered into an agreement that the trial court approved and entered into the record of these proceedings on December 1, 2003. The agreement reads in pertinent part as follows:

> 1) CHRISTUS St. Frances Cabrini Hospital will not distribute or disseminate the letters of April 7 and June 16, 2003, to any healthcare organization, entity, or insurer.
>
> 2) CHRISTUS St. Frances Cabrini Hospital will not take any further adverse action regarding Dr. Granger's former privileges at CHRISTUS St. Frances Cabrini Hospital. Dr. Granger will not reapply for medical staff privileges during the pendency of this action.
>
> 3) If questioned by any licensing or credentialing entity concerning the summary suspension of December 19, 2002 to January 10, 2003, CHRISTUS St. Frances Cabrini Hospital shall reply: "Dr. Granger was summarily suspended on December 19, 2002. An ad hoc committee investigated the incident. Dr. Granger was restored to full medical staff privileges on January 10, 2003."
>
> 4) If questioned by any licensing or credentialing entity concerning Dr. Granger's medical staff status, CHRISTUS St. Frances Cabrini Hospital will reply: "Members of the medical staff are

appointed for two-year terms. Dr. Granger's last appointment expired July 31, 2003. He did not apply for renewal of his former privileges in the Section of Surgery."

The litigation moved through the trial court system in the ensuing years and, following a September 10, 2007 hearing, the trial court granted a partial summary judgment, finding that the Health Care Quality Immunity Act (HCQIA), 42 U.S.C.A. 11112, *et seq.*, provided Cabrini Hospital immunity from any damage claims arising from the summary suspension of December 19, 2002. Although Cabrini Hospital had asked the trial court to dismiss Dr. Granger's other claims against it on the basis of HCQIA immunity, the trial court denied those motions for summary judgment. On October 28, 2008, in an unpublished opinion, a panel of this court rejected Dr. Granger's application for a supervisory writ on the summary suspension-immunity issue, finding that the trial court ruling on the partial summary judgment was not a final and appealable judgment. *Granger v. Christus Health Cent. La.*, 08-1272 (La.App. 3 Cir. 10/29/08).

On June 8, 2010, Dr. Granger amended his petition again and added claims of negligent misrepresentation, fraud, and tortious interference with a contract. In the pleadings setting forth the new causes of action, Dr. Granger asserted that he had only recently learned of the automatic suspension recommendations acted upon in the May 29, 2003 Medical Executive Committee meeting and the June 6, 2003 Board Executive Committee meeting.

The matter went to a jury trial beginning June 22, 2010. However, after both parties had rested, the trial court *sua sponte* dismissed Dr. Granger's claims for defamation and fraud.

In reaching its judgment in favor of Dr. Granger, the jury answered the applicable interrogatories and concluded that (1) Cabrini Hospital took the peer

37

review action at issue in the litigation with malice and without a reasonable belief that the action was warranted by the known facts; (2) Cabrini Hospital's peer review action was not taken in the reasonable belief that the action was in the furtherance of quality health care; (3) Cabrini Hospital failed to substantially comply with the hospital's bylaws in the peer review proceeding; (4) Cabrini Hospital's conduct caused revocation of Dr. Granger's privileges at Cabrini Hospital; (5) in its peer review activities, Cabrini Hospital engaged in unfair or deceptive trade practices against Dr. Granger; (6) and that Dr. Granger was harmed by the actions of Cabrini Hospital. The jury went on to find that Cabrini Hospital made negligent misrepresentations concerning Dr. Granger in its peer review action and that the negligent misrepresentations also caused Dr. Granger harm.

With regard to the issue of damages, the jury concluded that Dr. Granger had suffered $2,900,000.00 in lost past income and $1,000,000.00 in general damages. The jury rejected Dr. Granger's claim for loss of future income.

## ASSIGNMENTS OF ERROR

Cabrini Hospital has five assignments of error, with various sub-issues included within them:

> 1. Whether the District Court committed prejudicial legal error when it denied, in part, Cabrini's Motion for Summary Judgment, and it otherwise refused to apply HCQIA and Louisiana state law immunity to bar all of the claims of Dr. Granger for monetary damages for the peer review investigation into his conduct and behavior in the treatment of a patient at Cabrini.
>
> > a. Whether the District Court committed prejudicial legal error when it refuse to apply HCQIA and state law immunity to the claims of Dr. Granger despite the fact that no adverse action was taken by Cabrini against Dr. Granger in the peer review process.
> >
> > b. Whether the District Court committed prejudicial legal error when it refused to apply HCQIA and state law immunity to the claims of Dr. Granger despite the fact that

38

Cabrini's decisions made in the peer review to investigate his conduct and behavior were objectively reasonable at the time they were made to protect patient safety and the quality of medical care at the hospital.

    c.    Whether it was clearly erroneous and prejudicial error for the jury to find that Cabrini did not act without malice and without a reasonable belief that the peer review of Dr. Granger was in the furtherance of quality health care, in the absence of any such evidence in the record.

    d.    Whether the District Court abused its discretion and committed prejudicial error when it denied Cabrini's Motion in Limine to excluded [sic] the testimony of Dr. Huntoon at trial and subsequently permitted Dr. Huntoon to testify, over Cabrini's objection, as an expert in the field of peer review and sham peer review.

    e.    Whether the District Court abused its discretion and committed prejudicial legal error when it allowed damage claims and testimony concerning the summary suspension to go to the jury.

2.    Whether the District Court committed prejudicial legal error when it denied Cabrini's Motion for Summary Judgment and otherwise allowed Dr. Granger to present claims to the jury for a violation of the LUPTA despite the fact that he had no standing to assert those claims and whether it was clearly erroneous and prejudicial for the jury to find that Cabrini had engaged in unfair or deceptive trade practices and that such conduct had harmed Dr. Granger, in the absence of such evidence in the record.

3.    Whether the District Court committed prejudicial legal error when it denied Cabrini's Motion for Summary Judgment to dismiss Dr. Granger's breach of contact claim, or whether it otherwise abused its discretion, when it instructed the jury that a contract existed between Dr. Granger and Cabrini and whether it was clearly erroneous and prejudicial error for the jury to find that Cabrini had failed to substantially comply with the alleged contract and that such alleged failure caused the revocation of Dr. Granger's privileges at Cabrini, in the absence of such evidence in the record.

4.    Whether the District Court committed prejudicial legal error when it denied Cabrini's Motion for Summary Judgment to dismiss Dr. Granger's negligent misrepresentation claim, or whether it otherwise abused its discretion, in instructing the jury on the issue of negligent representation and whether it was clearly erroneous and prejudicial error for the jury to find Cabrini liable for negligent misrepresentation, in the absence of such evidence in the record.

5.      Whether it was clearly erroneous and prejudicial error for the jury to find that Dr. Granger had proved that he had been personally damaged by any actions of Cabrini, or that he had been damaged at all, much less in the amount of $3.9 million, or that he was entitled to any recovery of general damages, in the absence of any such evidence in the record.

a.      Whether, because the jury failed to segregate damages between the summary suspension and the remainder of Cabrini's peer review activities (or amongst any of Dr. Granger's claims presented to the jury), the verdict must be set aside or, alternatively, remanded to the District Court for a new trial on damages.

Dr. Granger answered the appeal, with two assignments of error:

A.      The trial court erroneously granted the Partial Summary Judgment based on the Health Care Quality Immunity Act ("HCQIA"), 42 U.S.C. 11112, for Defendant's actions in causing the wrongful Summary Suspension of Plaintiff's hospital privileges.

B.      The trial court erroneously dismissed, *ex proprio motu*, the Plaintiff's claims for defamation and fraud at the close of the jury trial on the merits.

## STANDARD OF REVIEW

The standard of review differs as we examine the various issues that the parties raise. This court reviews summary judgments *de novo*. *Guilbeaux v. Times of Acadiana, Inc.*, 96-360 (La.App. 3 Cir. 3/26/97), 693 So.2d 1183, *writ denied*, 97-1840 (La. 10/17/97), 701 So.2d 1327. We also review statutory interpretations *de novo*. *Stewart v. Estate of Stewart*, 07-333 (La.App. 3 Cir. 10/3/07), 966 So.2d 1241. Where the trial court's decision is based on an error of law, our standard of review is *de novo*. *Hooper v. Hooper*, 06-825 (La.App. 3 Cir. 11/2/06), 941 So.2d 726, *writ denied*, 06-2823 (La. 1/26/07), 948 So.2d 177. However, we review a jury's factual findings for manifest error. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Thus, "where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon

review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Id*. at 844 (citations omitted).

## OPINION

### *Summary Judgment Issues Raised by Both Parties*[12]

Both Cabrini Hospital and Dr. Granger raise questions concerning the trial court's grant of a partial summary judgment in favor of Cabrini Hospital, finding it immune from damage claims arising from the summary suspension of December 19, 2002, based on the provisions of HCQIA but not dismissing the remainder of Dr. Granger's causes of action. Cabrini Hospital asserts on appeal that the trial court erred in not granting it full immunity and dismissing the litigation in its entirety based on HCQIA. Dr. Granger asserts that the trial court erred in granting the partial summary judgment.

The motion for summary judgment is a procedural device whose purpose is to avoid a full-scale trial when there is no genuine issue of material fact. *Melder v. State Farm Mut. Auto. Ins. Co.*, 11-98 (La.App. 3 Cir. 6/1/11), 66 So.3d 603. Summary judgment procedure is "designed to secure the just, speedy, and inexpensive determination of every action," except certain domestic actions; the "procedure is favored and shall be construed to accomplish those ends." La.Code Civ.P. art. 966(A)(2); *Racine v. Moon's Towing*, 01-2837 (La. 5/14/02), 817 So.2d 21. The burden of proof on the motion for summary judgment remains with the movant. La.Code Civ.P. art. 966(C)(2).

> However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or

_____

[12] Cabrini Hospital's assignments of error are rather confusing. The first four combine assertions relating to summary judgment issues with issues addressed to the merits. That being the case, we will address the issues raised individually instead of attempting to address the assignments themselves in the order of presentation.

41

defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

La.Code Civ.P. art. 966(C)(2). The motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B).

As has already been established by the review of the evidentiary record and as will be further established by the review of the remaining assignments of error, the issue concerning the application of HCQIA addressed by the trial court in considering the motion for summary judgment is fact-intensive, and there were obvious genuine issues of material fact present in the litigation at that time. We find no error in the trial court's refusal to grant Cabrini Hospital's motion for summary judgment on Dr. Granger's claims arising from the post-summary suspension actions. For the same reasons, we find that the trial court erred in granting the partial summary judgment dismissing Dr. Granger's claim for damages based on the actions associated with the initial summary suspension. This reversal requires no remand because the record is complete on this issue.

### HCQIA and Louisiana State Law Immunity Issues

The United States Congress enacted HCQIA in 1986. Its purpose is to provide protections for peer review of physicians' actions, in an effort to reduce medical malpractice, to improve the quality of medical care, and to prevent incompetent physicians' movements from state to state without disclosure of previous incompetent performance. 42 U.S.C.A. § 11101. HCQIA was designed

to promote "frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits." *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1322 (11th Cir. 1994), *cert. denied*, 514 U.S. 1019, 115 S.Ct. 1363 (1995) (footnote omitted). If a professional review action meets the requirements set forth in HCQIA, the review body and all the persons involved in the process "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." 42 U.S.C.A. § 11111(a)(1).

Under HCQIA, a professional-review bodies' actions regarding peer review must be made:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and,
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C.A. § 11112(a).

HCQIA also provides that while the reasonableness requirements of 42 U.S.C. § 11112(a)(1), (2), and (4) are still applicable, the notice and hearing requirements of 42 U.S.C.A. § 11112(a)(3) are not applicable under the following circumstances:

For purposes of section 11111(a) of this title, nothing in this section shall be construed as--

(1) requiring the procedures referred to in subsection (a)(3) of this section--

(A) where there is no adverse professional review action taken, or

(B) in the case of a suspension or restriction of clinical privileges, for a period of not longer than 14 days, during which an investigation is being conducted to determine the need for a professional review action; or

(2) precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual.

42 U.S.C.A. § 11112(c)(1-2).

Thus, under HCQIA, regardless of whether the disposition in a peer review action is ultimately supported by the surrounding evidence, the agency responsible for the disposition is insulated from liability arising from that review if it complied with the reasonableness and notice requirements of 42 U.S.C.A. § 11112(a), as modified by 42 U.S.C.A. § 11112(c)(1-2). That is to say, HCQIA does not confer absolute immunity to a peer review committee, but grants immunity only when the statutory requirements are met.

Louisiana's protection for peer review committees [13] is found in R.S. 13:3715.3, which provides that no peer review committee "shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of such committee if such committee member acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him." La.R.S. 13:3715.3(C). Thus, the concept of

_____

[13] Cabrini Hospital did not move for summary judgment on the basis of Louisiana's state law immunity statute. However, it did raise Louisiana state law immunity in its affirmative defenses, and we address it with our HCQIA immunity analysis.

44

malice is added into the liability equation by Louisiana state law. The statute is silent concerning any procedural protections as are found in HCQIA.

In answering the interrogatories propounded to it, the jury in this matter found that the evidence established that the peer review action taken by Cabrini Hospital in Dr. Granger's case was not without malice and was not taken in a reasonable belief that its action was warranted by the facts known to it, nor did it take its action in the reasonable belief that it was in furtherance of quality health care. The jury also found that Cabrini Hospital failed to substantially comply with its own bylaws in the peer review proceeding. Assuming no manifest error in these factual findings, Cabrini Hospital would not be entitled to immunity under either the federal or state statutes

The jury had before it other evidence in addition to that previously set forth in our discussion of the evidentiary record. One significant item of evidence not previously mentioned is a May 27, 2003 recorded telephone conversation between Dr. Granger and Dr. Bennett, who at that time was the President of the Medical Staff. The following exchange took place in that conversation:

> **Dr. Granger**: And I think this whole thing has been some rules to get me out because there were people who were [mad] that patients were being transferred from Cabrini to Rapides for surgery because there is a better quality of care for heart surgery.

> **Dr. Bennett**: I won't sit here and try to tell you that's not entirely possible as an agenda, as a covert agenda on the part of the administration. … again, I can't say that it's something I know for a fact, but it wouldn't surprise me that that weren't part of it. That becomes the other way to, I don't know if you're willing to do this, that would be to resign from staff, which is probably what they want you to do.

> . . . .

> **Dr. Bennett**: Well, those are the suggestions that I can make and again, for whatever it's worth, I will do whatever I can do to help you out on this. Finley is leaving Cabrini. Cabrini is in the process of

> searching for a new CME. And, as much as I hate to say this, BUT the solution to it may be to resign from the staff until the administration changes there. And I don't know if you are willing to do that, and if you're not, we've got to figure out something that we can do with this other thing that has gone before the board and everything else.

Although he may have done so, the evidentiary record before us does not establish that Dr. Bennett shared his suspicions with the Medical Executive Committee at its meeting two days later. It reflects only that he told those present at the meeting that he had spoken to Dr. Granger "and had advised him to resign or do the referral, but to no avail."

The jury also had the benefit of the testimony of Dr. Lawrence Huntoon, a Eden, New York neurologist, who was recognized by the trial court "as an expert in the field of peer review medical disciplinary proceedings." According to Dr. Huntoon, although there may be a time when summary suspension is necessary to prevent possible imminent danger to a patient, it is the harshest action a hospital can take against a physician. This is because a summary suspension will follow a physician for the remainder of his career. A physician subject to a summary suspension would be required to report the incident each time he applied for privileges at any hospital as well as when he attempted to renew his license to practice medicine. The very existence of a summary suspension on a physician's record might result in a denial of privileges or license renewal, and either of these actions would require a report to the National Practitioner Data Bank. Thus, in the case of Dr. Granger, his mobility as a physician and perhaps his career has been injured by Cabrini Hospital's action.

Dr. Huntoon asserted that because of the potential effect any disciplinary action might have on an individual physician, it is extremely important that the peer review agency follow the reasonableness and notice requirements set forth in

46

HCQIA and its own internal rules and regulations. According to Dr. Huntoon, in the case of Dr. Granger, Cabrini Hospital did neither.

According to Dr. Huntoon, the intent of the initial summary suspension was suspect given the fact that it was purportedly imposed because of the possibility of imminent danger to Dr. Granger's patient. Yet, assuming Dr. Granger needed direction on his failures in this regard, he received none. He was simply placed on summary suspension for twenty-one days and readmitted to full privileges without any remedial or corrective action being taken to correct the behavior giving rise to the suspension. This suggested to Dr. Huntoon that the underlying reason for the summary suspension entailed something other than patient care.

Dr. Huntoon pointed to the statement in Dr. Finley's January 9, 2003 letter to the effect that "[t]he Summary Suspension was appropriate" as further evidence that the original summary suspension was about something other than patient care. He noted that the statement had the effect of perpetuating the issue, because, had that statement not been made a part of the letter, the fact of the summary suspension would have simply gone away as if it never existed because the letter could be construed as finding that the original summary suspension was in error.[14] Instead, by that letter being placed in Dr. Granger's file, the summary suspension has the effect of being highly damaging to Dr. Granger, as it will then follow him throughout his career and require him to constantly report it to other agencies. Dr. Huntoon had no difficulty in categorizing the summary suspension as an unfavorable recommendation.

According to Dr. Huntoon, as the investigation began to focus on personality issues rather than patient-treatment issues, Cabrini Hospital continually failed to

---

[14] Article VII, Section 5(a) of the Bylaws affirmatively stated that the fact that a physician may be subject to summary suspension, that action "shall not imply any final finding of responsibility for the situation that caused the suspension."

follow its own bylaws in the way it handled the situation, particularly in denying Dr. Granger a hearing, in failing to inform him of the issues being investigated and the general nature of the evidence directed toward those issues, and in referring him to anger management evaluation and treatment in the face of the three psychiatric evaluations which Dr. Granger had recently undergone. He found it particularly egregious that Dr. Granger was not provided an interview wherein he could discuss, explain, or refute the charges concerning his personality.

Dr. Huntoon also pointed out that many of the actions by both the Medical Executive Committee and the Board Executive Committee exceeded their recommendation authority and were more in the nature of mandates to Dr. Granger. Again, with respect to notice and the opportunity to be heard, he pointed out that the Cabrini Hospital Bylaws allow a hearing from a recommendation of either the Medical Executive Committee and the Board of Directors. Dr. Granger was not only never notified of his right to a hearing, but each time he requested a hearing, his request was denied.

Given the overall history of the hospital's actions, Dr. Huntoon was also of the opinion that the Board of Directors, at its July 30, 2003 meeting, by tabling any additional action pending the August 12, 2003 court hearing, intended to take further action against Dr. Granger in the future. Specifically, he was of the opinion that the Board of Directors intended to retroactively revoke Dr. Granger's privileges, even though Dr. Granger had not petitioned to have them renewed when they lapsed on July 30, 2003. If the Board of Directors were to take this course of action, the revocation would be another action that Dr. Granger would have to report in future applications.

48

Dr. Huntoon also suggested that the process was flawed because most of the members of the Board Executive Committee were also members of the Medical Executive Committee.[15] This, according to Dr. Huntoon, had the effect of the Board Executive Committee reviewing its own work. Dr. Huntoon opined that the primary reasons for the actions taken against Dr. Granger centered around his complaints to the hospital administration concerning patient care and his transfer of patients to Rapides Regional. Thus, they were punitive in nature and not in the furtherance of quality health care.

Cabrini Hospital challenged Dr. Huntoon's right to testify at trial, and the trial court rejected its objection. Specifically, the hospital asserts on appeal that the trial court erroneously recognized Dr. Huntoon as an expert in the field of "sham peer review." We find no merit in this argument. Cabrini Hospital did question Dr. Huntoon concerning whether he was an expert in sham peer review, and referred to him as such. When it did so, Dr. Huntoon himself objected to the attempt to distort his expertise. The record is clear that Dr. Huntoon was offered at trial "as an expert in the field of peer review medical disciplinary proceedings," and the trial court accepted him as an expert in that field only.

Even were we to consider Cabrini Hospital's assignment of error as suggesting that Dr. Huntoon should not have been allowed to testify at all, we would find no merit in that argument as well. The admissibility of expert testimony is generally governed by La.Code Evid. art. 702, which provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

---

[15] The record reflects that three out of the five members of the Board Executive Committee (Drs. Carlton, Bennett, and Gates) who met on March 10, 2003, were also members of the Medical Executive Committee who had participated in the initial action in December of 2002.

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." A trial court's determination of whether an expert meets these qualifications and whether he or she is competent to testify in a specialized area is subject to the abuse of discretion standard of review. *Cheairs v. State ex rel. DOTD*, 03-680 (La. 12/3/03), 861 So.2d 536. Dr. Huntoon is a member of the Board of Directors of the Association of American Physicians and Surgeons and serves on its Committee to Combat Sham Peer Review. He serves on the Erie County Medical Society Health Care Law Committee and the Erie County Medical Society Economic Committee and is also editor-in-chief of the Association of American Physicians and Surgeons' peer review medical journal. Dr. Huntoon has published numerous papers and given many lectures on peer review. We find no abuse of the trial court's great discretion in allowing Dr. Huntoon to testify as an expert in peer review.

The jury also heard the testimony of Dr. Harry Roach, a New Orleans, Louisiana cardiovascular and thoracic surgeon at East Jefferson General Hospital, who testified concerning the care of Dr. Granger's patient. According to Dr. Roach, there was nothing wrong with Dr. Granger removing the blood clot in the patient's room because relieving the airway was the important thing. Additionally, in his professional opinion, it was appropriate for Dr. Granger to send his patient to ICU. Furthermore, he saw no reason why the patient could not have gone through surgery the next day. As the individual who was to perform the surgery, he would have expected his anesthesiologist to ask him before cancelling a surgery.

As stated in *Ardoin v. McKay*, 06-171, p. 9 (La.App. 3 Cir. 9/27/06), 939 So.2d 698, 704, *writ denied*, 06-2606 (La. 1/8/07), 948 So.2d 126 (alterations in original):

Our review of the factual findings of the jury must be conducted in accordance with the familiar precept announced by our supreme court that, "[i]f the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990). Also, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

Obviously, we do not have written reasons from the jury from which we can determine exactly how its members analyzed the facts to reach the answers it rendered in responding to the propounded interrogatories. We do recognize, however, that the evidentiary record in this case clearly supports two permissible views of the evidence, depending on how one interprets the testimony and documentary evidence, and we are bound by the supreme court's guidance in concluding that the jury's factual determinations are not manifestly erroneous. That being the case, the jury's factual determinations deny Cabrini Hospital the immunity protection otherwise available under HCQIA and La.R.S. 13:3715.3.

After answering the first interrogatory to the effect that Cabrini Hospital acted without a reasonable belief that its action was warranted by the known facts, the jury was instructed to skip the next few interrogatories relating to Cabrini Hospital's "reasonable effort to obtain the facts of the matter," whether "Dr. Granger received such procedures as are fair to the physician under the circumstances," and whether "Cabrini Hospital took such peer review action in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain the facts." From the instructions provided the jury, it is clear that the answer to the first interrogatory encompassed all of these questions, and the jury's response is adverse to the Cabrini Hospital's interests in all respects. The jury also answered the next interrogatory to the effect that Cabrini Hospital

51

failed to substantially comply with its bylaws in effecting the peer review of Dr. Granger's behavior. All of these factual findings, when combined, reject Cabrini Hospital's argument that it complied with the requirements of 42 U.S.C.A. § 11112(a).

Looking at the additional element of malice as required by La.R.S. 13:3715.3(C), we first note that malice is defined as "[t]he intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent." BLACK'S LAW DICTIONARY 1109 (4th ed. 1968). The Louisiana Supreme Court has suggested that even a negligent act can constitute malice where "it amounts to recklessness and inexcusable indifference of the rights of plaintiff." *Robinson v. Goudchaux's*, 307 So.2d 287, 290 (La.1975). In fact, in such a situation, "malice is presumed." *Id.*

Given the evidentiary record before us, we cannot find manifest error in the jury's determination that malice existed in some of the actions of representatives of Cabrini Hospital. Thus, Cabrini Hospital cannot rely on La.R.S. 13:3715.3(C) for immunity from suit in this case.

### *Summary Suspension Issue at Trial*

As previously stated, the trial court granted Cabrini Hospital a partial summary judgment dismissing all of Dr. Granger's damage claims arising from the December 19, 2002 decision to summarily suspend his clinical privileges. On appeal, Cabrini Hospital asserts that the trial court erred in allowing this claim to be considered by the jury in the face of the prior decision in its favor. We find no merit in this argument.

In its jury instructions, the trial court did not instruct the jury that it was not to award damages based on Cabrini Hospital's summary suspension of Dr. Granger from December 19, 2002 through January 9, 2003, but in opening statement, Dr. Granger's counsel admonished the jury that it could not decide the appropriateness of the summary suspension, and in its closing statement Cabrini Hospital's counsel admonished the jury, without objection, that it could not award damages for the summary suspension. That being the case, we conclude that any error from not including a jury instruction stating that no damages could be awarded for the summary suspension was harmless. We find no merit in this assignment of error.

Although we find no merit in this argument, we also note that the matter should have gone to the jury because, as previously stated, the trial court erred in granting Cabrini Hospital's partial motion for summary judgment on this issue. However, our review of the record causes us to conclude that this also constitutes harmless error.

When Dr. Carlton heard Dr. Finley's concerns on December 19, 2002, he was faced with what appeared at the time to be a situation where failure to take action on the information provided might have resulted in "imminent danger to the health and/or safety" of Dr. Granger's patient.[16] *See* Article VII, Section 5(a) of the Bylaws. It would be reasonable for Dr. Carlton to conclude that waiting for a written request from Dr. Finley, as required by Article VII, Section 1(d), might place the patient's health in even greater danger. Additionally, Dr. Carlton's action in presenting the seemingly urgent matter to the Medical Executive Committee at its afternoon meeting would be reasonable, considering the source of the complaints. Furthermore, given Dr. Finley's presentation to the Medical Executive

---

[16] As previously stated, we do not know the full extent of Dr. Finley's comments to Dr. Carlton, but one can assume that he presented Dr. Carlton with far more than his trial complaint that Dr. Granger had spoken ill of the nursing staff in the presence of the patient.

Committee, its reaction was reasonable. Therefore, the initial action of the Medical Executive Committee is not actionable.

The fact that we find Dr. Granger cannot recover damages for the initial summary suspension does not mean that we conclude the evidence in that regard should not have been admitted. The facts surrounding the initial inquiry are part of the relevant overall evidentiary scenario which the jury was entitled to hear.

### *Breach of Contract Claim*

Cabrini Hospital also asserts that Dr. Granger failed to prove either the existence of a contract or a breach of a contract between the two parties. We find no merit in this argument.

There clearly exists a contractual relationship between Cabrini Hospital and Dr. Granger. Louisiana Civil Code Article 1906 provides that "[a] contract is an agreement by two or more persons whereby obligations are created, modified, or extinguished." Four elements are required for formation of a contract: capacity, consent, certain object, and lawful cause. *McPherson v. Cingular Wireless, L.L.C.*, 07-462 (La.App. 3 Cir. 10/3/07), 967 So.2d 573. All of these elements are present in the relationship between Cabrini Hospital and Dr. Granger.

Cabrini Hospital operates as a non-profit medical care facility and provides physician care to its patients through its medical staff. The specifics of how the medical staff is selected and functions are set forth in the Bylaws with particularity. Under Article III, Section 2, any physician seeking a medical staff appointment must possess specific qualifications, and staff membership is not automatic simply because one holds a license to practice in his or her specialty. Article III, Section 3. In exchange for staff privileges, the physician must agree to abide by certain specific terms of ethical and religious behavior particular to a Catholic-run hospital.

Article IV controls the application process, and Section 1 required that the application be in writing on a form prescribed by the Board of Directors. Additionally, Article IV establishes nine distinctive "undertakings" in Section 3(a) and eight "requirements" in Section 3(b) that an applicant must agree to and/or meet just to successfully complete the application process. One of the "undertakings" listed is "an agreement to abide by all Hospital and Medical Staff Bylaws, rules and regulations and policies." Article IV, Section 3(a)(2).

The signed application is then submitted and goes through a number of steps before being submitted to the Board of Directors for final action. If approved by the Board of Directors, the applying physician is granted staff privileges in one of the five categories set forth in Article II. Clearly this process effects the four elements necessary to form a contract. It is also implicit that Cabrini Hospital will provide a staff physician the procedural protections afforded under the Bylaws.

The jury found that in this case, Cabrini Hospital did not do so. We find no manifest error in that factual finding.

### *Louisiana Unfair Trade Practices and Consumer Protection Act Claim*

In his pleadings, Dr. Granger asserted a claim under the Louisiana Unfair Trade Practices and Consumer Protection Act (LUTPA), La.R.S. 51:1401, *et seq.* In answering an interrogatory obviously addressing that cause of action, the jury concluded that in its peer-review action against Dr. Granger, Cabrini Hospital engaged in unfair or deceptive trade practices. On appeal, Cabrini Hospital asserts that Dr. Granger did not have standing to bring a claim against Cabrini Hospital under LUTPA and, in the alternative, Cabrini Hospital asserts that even if Dr. Granger had standing to bring such a claim, it was without merit because Cabrini

Hospital acted reasonably and did not engage in an unfair or deceptive act or practice.

LUTPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La.R.S. 51:1405(A). It provides that "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action" to recover actual damages plus costs and attorney fees. La.R.S. 51:1409. "What constitutes unfair competition is a matter to be decided in each individual case." *Risk Mgmt. Servs., L.L.C. v. Moss*, 09-632, p. 10 (La.App. 5 Cir. 4/13/10), 40 So.3d 176, 184, *writ denied*, 10-1103 (La. 9/3/10), 44 So.3d 683.

This court has ruled that to have standing under LUPTA, the plaintiff must show that he was either a direct consumer or a business competitor of the defendant. *Washington Mut. Bank v. Monticello*, 07-1018 (La.App. 3 Cir. 2/6/08), 976 So.2d 251, *writ denied*, 08-530 (La. 4/25/08), 978 So.2d 369. A "consumer" in terms of LUPTA is "any person who uses, purchases, or leases goods or services," La.R.S. 51:1402(1), and Dr. Granger would clearly not be considered a consumer in relation to Cabrini Hospital. To be considered a "business competitor" under LUPTA, Dr. Granger must establish that he "engages in business that competes directly or indirectly with [Cabrini Hospital] as a business competitor." *Vermillion Hosp., Inc. v. Patout*, 05-82, p. 5 (La.App. 3 Cir. 6/8/05), 906 So.2d 688, 692. Under this court's jurisprudential rulings, Dr. Granger would not have standing to bring a LUPTA claim against Cabrini Hospital.

However, this circuit's opinions concerning the standing issue is in conflict

with the first circuit's opinion in *Jarrell v. Carter*, 577 So.2d 120 (La.App. 1 Cir.),

*writ denied*, 582 So.2d 1311 (La.1991), which held that a plaintiff who was neither

a business competitor nor a consumer had standing under LUPTA.  In an apparent

effort to resolve the conflict between the circuits,[17] our supreme court has issued a

plurality opinion in *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*,

09-1633 (La. 4/23/10), 35 So.3d 1053, wherein three justices accepted the first

circuit's position, one concurred in the result of the opinion only without comment,

and two concurred in the result of the opinion with reasons wherein they rejected

an expansion of the LUPTA standing issue past the position of this court.[18]  Justice

Weimer, in writing for the court, analyzed the definitions set forth in La.R.S.

51:1402, and concluded :

> An examination of these sections of LUTPA reveals that the
> legislation contains no language that would clearly and expressly bar a
> "person" (such as the individual and the corporation that are the
> plaintiffs herein) from bringing an action for unfair trade practices.
> To the contrary, LUTPA grants a right of action to any person, natural
> or juridical, who suffers an ascertainable loss as a result of another
> person's use of unfair methods of competition and unfair or deceptive
> acts or practices in the conduct of any trade or commerce.  Although
> business consumers and competitors are included in the group
> afforded this private right of action, they are not its exclusive
> members.  As noted in *Capitol House Preservation Company, L.L.C.
> v. Perryman Consultants, Inc.*, 98-1514, pp. 12-13 (La.App. 1 Cir.
> 12/10/98), 725 So.2d 523, 530, Louisiana courts have repeatedly held
> that there is no such limitation in LUTPA.
>
> An evaluation of the words of this statute leads to the
> conclusion that, consistent with the definition and usage of the word
> "person," there is no such limitation on those who may assert a
> LUTPA cause of action.  Any such limitation that has found its way
> into the jurisprudence resulted without proper analysis of the statute.
> *See Gil v. Metal Service Corp.*, 412 So.2d 706, (La.App. 4 Cir.), *writ
> denied*, 414 So.2d 379 (La.1982).  In *Hamilton v. Business Partners,
> Inc.*, 938 F.Supp. 370 (E.D.La.1996), the Court discussed contrary

---

[17] Opinions from other circuits are in conflict with the first circuit's ruling as well.

[18] Chief Justice Kimball did not participate in the deliberation of the opinion.

57

holdings in cases, both state and federal, that have held relief under LUTPA is limited to business competitors and consumers. Despite an acknowledgment in *Hamilton* that the seminal Louisiana case upon which subsequent jurisprudence relied could well be flawed, the limitation has been perpetuated in both state appellate courts and the federal courts interpreting Louisiana law

Based on the language of the statute, which does not contain a clear, unequivocal and affirmative expression that the private right of action provided in LSA-R.S. 51:1409(A) extends only to business competitors and consumers, LUTPA does not exclude other persons who assert a "loss of money or . . . property . . . as a result of the use or employment by another person of an unfair or deceptive method, act, or practice." Contrary holdings are hereby repudiated, because any limitation must be contained in the language of the statute.

We note the legislature, in enacting LUTPA in 1972, has provided certain limiting features. Although a plaintiff who obtains a judgment for damages pursuant to LSA-R.S. 51:1409(A) is entitled to an award for attorney fees and costs, LSA-R.S. 51:1409(A) also provides that if the plaintiff is unsuccessful and the court finds that the action "was groundless and brought in bad faith or for purposes of harassment," the defendant may be awarded attorney fees and costs. Further, the treble damages that a plaintiff may be entitled to are conditioned on a finding by the court of an "unfair or deceptive method, act, or practice [that] was knowingly used, after being put on notice by the attorney general." LSA-R.S. 51:1409(A); *see Faris v. Model's Guild*, 297 So.2d 536 (La.App. 4 Cir.1974), *writ denied*, 302 So.2d 15 (Plaintiff could not recover treble damages where defendant company was never placed on notice of any act, conduct or practice prohibited by statute or by any rule or regulation made by the State.).

*Id.* at 1057-58 (footnotes omitted) (alterations in original).

We need not decide in this case whether to follow the plurality view or the view expressed by at least two of the three concurring justices, because, even assuming he has standing to bring a LUTPA claim, application of the facts of this case to this matter cause us to conclude that LUTPA does not afford Dr. Granger a remedy.

We do not reach the question of whether the operation of a non-profit hospital is a "trade or commerce" under LUPTA. Instead, we conclude that the peer review action under scrutiny in this litigation is nothing more than a

58

disciplinary action authorized by the Bylaws that both the hospital and Dr. Granger agreed to be bound by. The fact that an underlying aspect of the disciplinary procedure may have been Dr. Granger's perceived disloyalty to Cabrini Hospital does not constitute an unfair trade practice under LUPTA.

Having reached that decision, we find merit in Cabrini Hospital's argument on this issue and set aside the jury's determination on this issue. We do so, not by finding that the jury reached manifestly erroneous factual conclusions on this issue, but that LUPTA does not afford Dr. Granger a remedy on the facts before us.

### *Negligent Misrepresentation Claim*

Louisiana allows a plaintiff to recover in tort for economic loss caused by negligent misrepresentation under La.Civ.Code arts. 2315 and 2316. *Barrie v. V.P. Exterminators, Inc.*, 625 So.2d 1007 (La.1993). To recovery under this theory, "there must be a legal duty on the part of the defendant to supply correct information, there must be a breach of that duty, and the breach must have caused plaintiff damage." *Id.* at 1015.

Whether the defendant owes a duty is a question of law. *Id.* Clearly, there was a legal duty on the part of Dr. Finley, acting in his capacity as Cabrini Hospital's Chief Medical Officer, to make a reasonable effort to thoroughly investigate any complaint against a staff physician, particularly one who had served as a Cabrini Hospital staff physician for eight years, before bringing a complaint to the Medical Executive Committee.

In this case, Dr. Finley did not receive any complaint from anyone. Instead, according to his own testimony, he initiated what was a very incomplete investigation based on nothing more than his concern with Dr. Granger's comments in front of the patient regarding the incompetence of the nursing staff.

Without confronting Dr. Granger with what appears on the surface to be a rather minor infraction given the circumstances under which Dr. Granger was summoned to the hospital on December 18, 2002, Dr. Finley took it upon himself to interview only the nurses before informing Dr. Carlton of his findings. Had he taken the time to speak with Dr. Freedman or Dr. Lindsey, review the medical chart, or even check with the hospital operating theater to confirm or reject Dr. Granger's assertion that he had reserved an operating room that evening to explore the wound, find the source of bleeding, and repair the wound, his investigation quite probably would have ended on the morning of December 19, 2002, and this matter would have gone no further. Instead, Dr. Finley chose not to assert his own authority to impose summary suspension on Dr. Granger, did not comply with the requirement that he file a written complaint with the Medical Executive Committee, and presented a scenario to the Medical Executive Committee that far exceeded his trial complaints.

As previously stated, despite the fact that it rendered the December 19, 2002 summary suspension recommendation on Dr. Finley's presentation, the Medical Executive Committee recommendation cannot be a basis of recovery by Dr. Granger. However, from that day forward, the record contains a picture of an investigative process by all those involved on behalf of Cabrini Hospital which ignored its own rules and regulations as set forth in its Bylaws; seemed to stonewall any efforts by Dr. Granger to provoke a hearing to air the complaints and give him an opportunity to defend himself; involved the transmission of correspondence to Dr. Granger concerning resolutions passed and actions taken by the Medical Executive Committee, Board Executive Committee, and Board of Directors which inaccurately depicted those resolutions; and ultimately placed the

doctor in a position of having to allow his staff privileges to lapse or risk being rejected.

Given the record as a whole, we can find no manifest error in the jury's determination that Cabrini Hospital negligently misrepresented its actions.

### *Defamation and Fraud Claims*

Dr. Granger asserts that the trial court erred in not allowing his claims for defamation and fraud to be decided by the jury. A directed verdict is the proper procedural device to foreclose a jury's decision on an issue after the close of evidence. La.Code Civ.P art. 1810; *Frazier v. Zapata Protein USA, Inc.*, 02-605 (La.App. 3 Cir. 12/11/02), 832 So.2d 1141, *writs denied*, 03-145, 03-126 (La. 3/21/03), 840 So.2d 537, 539. A trial court may not grant a directed verdict on its own motion but must do so on the motion of one of the litigants. *Id.*

In this matter, after the close of the evidence, the trial court, without any motion from Cabrini Hospital, struck Dr. Granger's defamation and fraud claims and disallowed the proposed jury instructions on them. This was clearly error and these issues should have been submitted to the jury. However, this error requires no remand because the record before us is complete as it relates to these issues. Because the trial court erred as a matter of law in dismissing these causes of action, we have reviewed these issues *de novo*. *Hooper*, 941 So.2d 726. Our review causes us to conclude that the error is harmless as to both claims.

There are four elements a plaintiff is required to prove in order to be successful in a defamation case: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Trentecosta v. Beck*, 96-2388, p. 10 (La. 10/21/97), 703 So.2d 552, 559. Although Dr. Granger asserted

at trial that the suspension and subsequent investigation had harmed his reputation in the community, he did not introduce any evidence showing how Cabrini Hospital had published any defamatory statements about him.

As to the fraud cause of action, La.Civ.Code art. 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." "Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." La.Civ.Code art. 1957.

There is no evidence that any representative of Cabrini Hospital misrepresented the truth in the investigation of Dr. Granger. Additionally, although Ms. Griffin's testimony contradicted some aspects of Dr. Finley's testimony, and although she spoke to Dr. Finley on the morning of December 19, 2003, before Dr. Finley spoke to Dr. Carlton, there is no evidence to suggest that she told Dr. Finley anything in that conversation that contradicted what he told the Medical Executive Committee later that day. At trial, Ms. Griffin was not asked to divulge the specifics of that conversation. Thus, there is no evidence that Dr. Finley suppressed the truth when he reported to the Medical Executive Committee.

Once the initial meeting with the Medical Executive Committee terminated, the future events can best be described as negligent in nature. Additionally, there was no evidence in the record to establish that Cabrini Hospital intended to cause Dr. Granger a loss or inconvenience. That may well have been Dr. Finley's objective, but to that extent he would have been acting outside of his capacity as an administrator for Cabrini Hospital, and it would not be liable for his acts in that circumstance. The only possible excuse for Cabrini Hospital's conduct in this

instance seems to have been negligence, in that the decisions made by the Medical Executive Committee, the Board Executive Committee, and the Board of Directors all were inaccurately communicated to Dr. Granger; that none of the various bodies' minutes and communications with Dr. Granger included the right to a hearing and an appeal; and that Dr. Finley failed to properly dispose of the January 9, 2003 disciplinary letter, instead leaving it in Dr. Granger's files. It appears that Cabrini Hospital's actions were dangerously negligent, but not intentionally harmful. Thus, we find no error in Dr. Granger's assignment of error.

### *Damages*

Finally, Cabrini Hospital contends that neither damage award is supported by the evidence. In reviewing this argument, we start with the admonition from the supreme court that "[i]t is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages." *Guillory v. Lee*, 09-75, p. 14 (La. 6/26/09), 16 So.3d 1104, 1116. Additionally,

> The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. This court has long held true to the following principle:

> > [b]efore a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

> *Wainwright* [*v. Fontenot*], 00-0492, p. 6 [(La. 10/17/00)], 774 So.2d [70,] 74 (quoting *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.[1976])).

*Id.* at 1117 (first two alterations in original).

The supreme court has also stated, in *Youn v. Maritime Overseas Corp.*, 623 So.3d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), that the discretion in awarding damages given to the trier of fact is "great" and even "vast," and an appellate court should rarely disturb a general damage award. Under *Youn* and its progeny, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id.* at 1260.

As stated in *Guillory*, "[s]pecial damages are those which have a "ready market value," such that the amount of damages theoretically may be determined with relative certainty, including medical expenses and lost wages." *Guillory*, 16 So.3d at 1117. In reviewing a special damage award, an appellate court "must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the factual finding must be clearly wrong." *Id.* at 1118.

General damages, including damages for embarrassment, humiliation, mental anguish, and worry, may be recovered for negligent misrepresentation. La.Civ.Code art. 2315; *Haggerty v. March*, 480 So.2d 1064 (La.App. 5 Cir. 1985). While we recognize that Dr. Granger sustained injury in all of these general damage categories, we cannot say that the record supports a $1,000,000.00 general-damage award. Applying the principles set forth in *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70, and *Coco v. Winston Indus, Inc.*, 341 So.2d 332 (La.1977), we reduce the general damage award to $100,000.00. *See Gulf Rice Milling, Inc. v. Sonnier*, 05-1432 (La.App. 3 Cir. 5/3/06), 930 So.2d 256, *writs denied*, 06-1846, 06-1855 (La. 10/27/06), 939 So.2d 1282, 1284.

64

With regard to the lost income claim, Cabrini Hospital argues that Dr. Granger's limited liability company earned the surgical fees, not Dr. Granger himself, and, therefore, he did not prove that he had lost income due to Cabrini Hospital's actions. However, Dr. Granger's tort claims against Cabrini Hospital were based on injuries he suffered himself, and his claim for breach of contract was based on a contract between himself and Cabrini Hospital, not between his limited liability company and Cabrini Hospital.

Cabrini Hospital also asserts that Dr. Granger did not prove that he had lost income because of its actions, arguing that Dr. Granger had voluntarily allowed his privileges at Cabrini Hospital to lapse. But this argument ignores the jury's factual finding that Cabrini Hospital's actions caused Dr. Granger to lose his privileges.

Finally, Cabrini Hospital asserts that Dr. Granger did not establish the amount of his lost income. Here, the jury obviously found credible the testimony from James A. Koerber, a Hattiesburg, Mississippi, certified public accountant, that Dr. Granger had lost $2,894,000.00 in income between January 1, 2003 and October of 2009. We do agree that the jury's award of an additional $6,000.00 is not supported by Mr. Koerber's testimony, which only analyzed Dr. Granger's lost income through October of 2009. Accordingly, we reduce the jury's award of lost income by $6,000.00.

## DISPOSITION

For the foregoing reasons, we reverse that part of the trial court judgment finding that Christus Health Central Louisiana violated the provisions of the Louisiana Unfair Trade Practices and Consumer Protection Act with regard to Dr. Tommie M. Granger; amend the award to Dr. Tommie M. Granger of $1,000,000.00 in general damages by reducing that award to $100,000.00; and

amend the award to Dr. Tommie M. Granger of $2,900,000.00 for past loss income by reducing that award to $2,894,000.00.  We affirm the judgment as amended. We assess all costs of this appeal to Christus Health Central Louisiana.

**AFFIRMED AS AMENDED.**

TOMMIE M. GRANGER, M.D.

VERSUS

CHRISTUS HEALTH CENTRAL LOUISIANA D/B/A CHRISTUS ST. FRANCES CABRINI HOSPITAL

**THIBODEAUX, Chief Judge, dissenting.**

I disagree with the majority's opinion. I would affirm the grant of partial summary judgment giving immunity to Cabrini for summarily suspending Granger, for striking Granger's claims of defamation and fraud, and would reverse the failure of the trial court to grant immunity to Cabrini for its actions after Granger's summary suspension.

Immunity to Cabrini for its pre and post-summary suspension actions is based on the Health Care Quality Improvement Act (HCQIA). Cabrini took no adverse professional action against Granger. Further, it was not Cabrini's action that caused Granger's damages, if any.[1]

Based on Dr. Finley's presentations, Cabrini summarily suspended Granger's privileges on December 19, 2002. The investigation of Granger's actions ensued. Three weeks after the suspension, the investigating committee interviewed Granger. The questions focused on the clinical issues, and no indication that the committee was investigating Granger's behavior was given.

---

[1]Because of my conclusion regarding Cabrini's immunity, I need not consider the following issues: (1) whether the trial court erred by allowing expert testimony of Dr. Lawrence Huntoon; (2) whether the trial court erred by holding that Granger had standing under Louisiana Unfair Trade Practices Act (LUTPA); (3) whether the trial court erred by holding that Granger had a breach of contract claim; (4) whether the jury's award of $3.9 million in damages was clearly erroneous; and, (5) whether Granger proved his defamation and fraud claims.

When the Medical Executive Committee (MEC) met on January 9, 2003, the minutes reflect that Granger's behavior was also a focus of the investigation. Granger received a letter from Cabrini informing him that the summary suspension was appropriate and that his clinical privileges were *fully restored*. The letter did not indicate that Cabrini was investigating Granger's behavior.

Granger requested a hearing on the propriety of the summary suspension, or, alternatively, a removal of the statement that the summary suspension was appropriate. Cabrini refused. Granger filed a suit seeking injunctive relief, i.e., a formal hearing from Cabrini.

Cabrini's Board directed the MEC to investigate further, focusing on Granger's behavior. At trial, there was testimony that further investigation ensued. Nevertheless, no evidence of that investigation was produced during the trial. Based on this investigation the MEC voted to recommend that Granger self-refer for anger management and counseling.

Granger was notified that the Board did not approve the MEC's recommendation of January 9, 2003, to issue a reprimand. Instead, Granger received communications by which he was (1) requested to undergo anger management, and, if he refused to do so, the MEC would recommend a revocation of his hospital privileges; and, (2) informed that he was placed on a six-month probation.

While the letter indicated that the MEC would *recommend* a revocation of Granger's privileges if he failed to undergo anger management, the minutes of the MEC meeting indicate that there would be an automatic revocation of his privileges. The Executive Committee of the Board formally adopted the MEC's recommendation that Granger's privileges must be automatically revoked if he did not undergo anger management. The recommendation regarding

2

automatic revocation was never communicated to Granger. Thus, as far as Granger was concerned, his privileges were completely restored as of January 9, 2003.

Granger refused to undergo anger management because he has already undergone two psychological examinations (one in connection with a custody dispute over his daughter and one at the request of his former business partners). Neither examination revealed any psychological problems.

The United States Congress enacted HCQIA that provides for a peer review process of physicians' actions to reduce medical malpractice, to improve the quality of medical care, and to prevent incompetent physicians' movements from state to state without disclosure of previous incompetent performance. 42 U.S.C. § 11101. As aptly observed by the majority, HCQIA was designed to promote "frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits." *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1322 (11th Cir. 1994), *cert. denied*, 514 U.S. 1019, 115 S.Ct. 1363 (1995) (footnote omitted). Under HCQIA, professional review bodies' actions regarding peer review must be made:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the

3

presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(a). If the professional review action meets the above requirements, the review body and all the persons involved in the process "shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action." 42 U.S.C. § 11111(a)(1).

*Summary Suspension*

HCQIA states that in cases where there is an imminent danger to the health of any patient, the notice and hearing requirements of the statute do not preclude "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures." 42 U.S.C. § 11112(c)(2).

Here, Granger wanted to perform a bypass surgery on a patient who had a life-threatening hematoma the day before. The patient lost a lot of blood as a result of the hematoma and its evacuation. The anesthesiologist thought that the patient was not in a condition to undergo another surgery while Granger insisted on operating. Based on these circumstances, it is reasonable to conclude that the patient's health may have been in imminent danger. Thus, the requirements of notice and hearing need not have been fulfilled prior to the suspension. Therefore, the trial court committed no error by granting a summary judgment in favor of Cabrini regarding its summary suspension of Granger. Furthermore, Granger had a hearing on January 8, 2003, after which Granger's privileges were *completely restored*. Thus, Cabrini's obligations of notice and hearing subsequent to summary suspension were fulfilled.

4

*Actions After the Summary Suspension*

Under HCQIA, adequate notice and procedure requirements need not be fulfilled if "there is no adverse professional review action taken." 42 U.S.C. 11112(c)(1)(A).

> The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9). Furthermore, the other requirements of 42 U.S.C. 11112(a) that refer to the manner in which the professional action should be taken, i.e., in reasonable belief that the action was in the furtherance of quality health care, after a reasonable effort to obtain facts, and in reasonable belief that the action was warranted, presuppose that there was some adverse professional review action taken. If there was no adverse professional action, these requirements are meaningless.

Here, Cabrini took no adverse professional action against Granger, and, therefore, the trial court committed error when it denied a summary judgment in Cabrini's favor. Moreover, even if there was an adverse professional action, the trial court committed a manifest error by finding that Cabrini caused Granger's damages.

A little over two weeks after Granger's summary suspension, Granger's hospital privileges were fully restored. Although Granger received a letter requesting his participation in an anger management program, his clinical

5

privileges, as far as Granger knew, were not adversely affected. That the minutes contain language regarding automatic revocation of the privileges if Granger failed to refer to anger management is of little consequence. Whether this was an ineptly-drafted language or, indeed, what the review body resolved, is difficult and unnecessary to ascertain. It is so because Granger was informed only that his privileges were restored and that he needed to undergo anger management. Based on this information, Granger *voluntarily* did not utilize the hospital and *voluntarily* abandoned his hospital privileges. Furthermore, he *voluntarily* decided not to renew his privileges once they lapsed at the end of July, 2003. Yet, he came to the court insisting he suffered damages resulting from a constraint on his privileges.

It is difficult for me to ascertain how Granger can obtain damages for a self-imposed restriction on his clinical privileges at Cabrini. Had he, in fact, received a notice that his privileges were revoked, or if, for example, he attempted but was prevented from performing his duties at Cabrini (which would indicate that the minutes, in fact, reflected the body's decision of automatic revocation), my conclusion would be different.

Based on the above, the trial court and the majority err by failing to recognize that no adverse action regarding Granger's hospital privileges was taken and by finding that he suffered damages as a result of Cabrini's actions. That the jury found malice and that the action was not in the furtherance of quality health care are irrelevant because no action was taken to begin with. Furthermore, any damages Granger incurred resulted from his self-imposed abdication of clinical privileges, not from Cabrini's restriction of them.

Based on these considerations, Granger failed to rebut the statutory presumptions. Thus, Cabrini should not be liable for any of Granger's alleged causes of action that arise out of the peer review process.

6

### *Defamation, Fraud, and LUTPA Claims*

To foreclose a jury's decision on an issue after the close of evidence, a directed verdict is the proper procedural device. *Frazier v. Zapata Protein USA, Inc.*, 02-605 (La.App. 3 Cir. 12/11/02), 832 So.2d 1141, *writs denied*, 03-145, 03-126 (La. 3/21/03), 840 So.2d 537, 539. A directed verdict should only be granted when, viewed in light most favorable to the nonmovant, the facts and inferences point so strongly in favor of the movant that no reasonable person would reach a different conclusion. *Id.* "A motion for a directed verdict *shall* state the specific grounds therefor." La.Civ.Code art. 1810 (emphasis added). Finally, a trial court may not grant a directed verdict on its own motion but must do so on the motion of one of the litigants. *Ross v. Baton Rouge Marine Inst., Inc.*, 96-2720 (La.App. 1 Cir. 2/20/98), 709 So.2d 829 (citing *Bourgeois v. McDonald*, 622 So.2d 684 (La.App. 4 Cir.), *writ denied*, 629 So.2d 1177 (La.1993); *Scholegel v. Robinson*, 416 So.2d 366 (La.App. 4 Cir. 1982)).

After the close of the evidence, the trial court, without any motion from Cabrini, struck Granger's defamation and fraud actions. Thereby, the trial court disallowed the jury instruction on these claims. Based on the above considerations, it was an error for the trial court to do so. Nevertheless, my conclusion that Cabrini has immunity with respect to its peer review process precludes my consideration of the defamation and fraud claims as they arise from that process. Similarly, it precludes consideration of whether Granger had standing under LUTPA and whether Granger had a breach of contract claim. These are also alternative theories of liability, and Cabrini is not "liable in damages under any law of the United States or of any State . . . ." 42 U.S.C. § 11111(a)(1). Finally, because the trial court erred by not granting a summary judgment in Cabrini's favor regarding Cabrini's actions after the summary suspension, I need not

consider whether the trial court erroneously allowed expert testimony of Dr. Lawrence Huntoon and whether the jury's damage award was clearly erroneous.

For the foregoing reasons, I respectfully dissent.